UGANSKI v. LITTLE GIANT CRANE & SHOVEL, INC.

1. SALES—EXPRESS WARRANTY—CREATION—EVIDENCE.

A manufacturer's agreement to build a crane that would do the work as well as or better than the crane which the buyer had, and the buyer's specificity in requiring a crane comparable in design and capability to his present crane constituted an express warranty of fitness for a particular purpose where the evidence showed that there would not have been a sale to the buyer without the agreement (MCLA § 440.2313).

2. SALES—IMPLIED WARRANTY—WARRANTY OF FITNESS FOR ORDINARY PURPOSE—BREACH.

A crane was not fit for the ordinary purpose for which it was intended, and thus, did not fulfill its implied warranty where numerous breakdowns occurred necessitating, among other

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 46 Am Jur, Sales §§ 346, 347.
[3] 46 Am Jur, Sales §§ 333, 354.
[4] 46 Am Jur, Sales §§ 259, 300.
[5] 46 Am Jur, Sales § 309.
[6, 7] 31 Am Jur 2d, Expert and Opinion Evidence §§ 181–183.
[8] 46 Am Jur, Sales § 497.
[9] 46 Am Jur, Sales §§ 737, 742, 747, 758, 765.
[10] 31 Am Jur 2d, Expert and Opinion Evidence §§ 137, 142, 144.
[11] 46 Am Jur, Sales § 753.
[12–14] 46 Am Jur, Sales § 799.

things, new gears, a muffler, new sheaves, and a new vertical drive assembly and sending the entire vertical drive assembly and later the entire transmission back to the manufacturer, and where, on the final breakdown, the crane was completely immobilized (MCLA § 440.2314).

3. SALES—IMPLIED WARRANTY—DISCLAIMER.
A crane manufacturer's standard warranty in the machine's maintenance and parts manual did not constitute a disclaimer of implied warranties where the manual was not made known to or delivered to the buyer at the time he ordered the crane or before the crane's delivery to him (MCLA §§ 440.2314, 440-.2316).

4. SALES—WARRANTY—ACCEPTANCE OF WARRANTY.
A buyer's acceptance of crane seller's free service and parts for 120 days, the period for which the crane was guaranteed in a written warranty to be free of defects, did not limit the manufacturer's liability to the 120-day period where the written guaranty had neither been made known to the buyer when he ordered the crane, nor had it been given to him prior to the delivery of the crane, there was no evidence that either the buyer or the manufacturer relied on the written warranty during the period when service and repairs were made to the crane, and the manufacturer repaired and serviced the crane without charge after the 120 days had expired.

5. SALES—IMPROPER DESIGN—EVIDENCE.
A crane sold to plaintiff was correctly held to have been improperly designed where the evidence showed that defendant had manufactured it exclusively to fulfill the plaintiff's particularly-defined needs, that the crane was the only one of its kind manufactured by defendant, and that the crane had many breakdowns and plaintiff had great difficulties in operating the crane.

6. EVIDENCE—OPINION TESTIMONY—WEIGHT—BINDING EFFECT.
Opinion testimony, however expert and authoritative, need not be accepted by the trier of fact as he proceeds to determine issues of fact duly committed to him for finding or verdict; opinion testimony is not of the highest order inasmuch as a man's opinion cannot be met and tested, as can his testimony to the existence of a fact.

7. SALES — CRANE — IMPROPER DESIGN — WITNESSES — EXPERT WITNESS.
Testimony of defendant's expert witness that the power train

of a crane sold to plaintiff was properly engineered and designed was not binding upon the trier of fact merely because the plaintiff offered no rebuttal expert testimony.

8. SALES—REVOCATION OF ACCEPTANCE—REASONABLE TIME.

Plaintiff's notice, on June 17, 1966, of revocation of acceptance of a highly complex, expensive crane, was given to defendant manufacturer within a reasonable time where the final breakdown of the crane, which rendered the crane totally immobile, occurred April 29, 1966, the crane distributor informed plaintiff that it could not guarantee that the crane would operate properly even if it were repaired, plaintiff, until the final breakdown, had been assured that the difficulties with the crane would be corrected, plaintiff had been led to believe that defendant would send a representative to discuss efforts toward correcting the crane problems, although the meeting never took place, and where it was obvious that plaintiff had not only relied on defendant's assurances but also had worked with defendant until it was apparent nothing further would be done to make the crane operative (MCLA § 440.2608).

9. DAMAGES—BREACH OF WARRANTY.

Plaintiff buyer of a crane was entitled to damages for the period during which he used the crane where the crane, which had been specially designed for him and which the manufacturer had promised would perform as well or better than a crane the plaintiff then owned, produced more noise than plaintiff's old crane, the clutches on the new crane screeched whereas the clutches on the old crane did not, and the new crane, unlike the old crane, did not provide down power (MCLA § 440.2715).

10. DAMAGES — LOST PROFITS — EVIDENCE — OPINION TESTIMONY — ADMISSIBILITY.

Opinion testimony of the owner of a business and other persons familiar with his operations as to the amount of damages he suffered by way of lost profits is admissible.

11. DAMAGES—LOST PROFITS—EVIDENCE.

Plaintiff was entitled to damages for loss of profits in his suit for breach of implied and expressed warranties in the purchase of a crane where plaintiff testified that had the crane been as warranted to him, he could have grossed an additional $100,000 a year over what he actually realized, with a net profit of between $15,000 and $16,000, the plaintiff had had over 25

years of experience in the truck and crane business and knew the available work in the years in which he owned the crane, and plaintiff's accountant corroborated the estimated lost profits.

12. SALES—REVOCATION OF ACCEPTANCE—RESALE—COMMERCIALLY REASONABLE TIME.

Plaintiff's sale of a crane, rejected as not fulfilling warranties, more than two years after he had given defendant notice of revocation of acceptance was not within a commercially reasonable time (MCLA § 440.2706).

13. SALES—REVOCATION OF ACCEPTANCE—RESALE—UNREASONABLE TIME—MARKET VALUE—BURDEN OF PROOF.

A party who resells goods following a rightful rejection or revocation of acceptance has the burden to prove that the price received on the resale is the fair market value where the sale has been unreasonably delayed.

14. SALES—REVOCATION OF ACCEPTANCE—RESALE—UNREASONABLE TIME—MARKET VALUE.

A case must be remanded for determination of the value of a crane at the time of notification of revocation of acceptance where plaintiff buyer, although rightfully revoking his acceptance, waited two years, an unreasonable time, before reselling the crane at auction and the record does not indicate the value of the crane at the time of the revocation.

Appeal from Muskegon, Albert J. Engel, J.  Submitted Division 3 January 7, 1971, at Grand Rapids. (Docket No. 8604.)  Decided July 23, 1971.

Complaint by John Uganski against Little Giant Crane & Shovel, Inc., and Great Lakes Equipment Company for breach of express and implied warranties.  Judgment for plaintiff against Little Giant Crane & Shovel, Inc.  Defendant Little Giant appeals.  Affirmed in part, reversed in part.

*Parmenter, Forsythe & Rude* (by *John M. Briggs, III*), for plaintiff.

*Poppen, Street, Sorensen & Engle,* for defendant
Little Giant Crane & Shovel, Inc.

Before: HOLBROOK, P. J., and McGREGOR and
T. M. BURNS, JJ.

HOLBROOK, P. J. This action was brought for
claimed damages suffered by plaintiff John Uganski,
purchaser, against defendant-appellant Little Giant
Crane & Shovel, Inc., manufacturer of the crane in
question, and Great Lakes Equipment Company,
local dealer who handled the sale of the crane to
plaintiff. The action was based on express and im-
plied warranties. The matter was heard in the
Circuit Court for Muskegon County in a five-day
trial that commenced April 29, 1969. The trial
judge, the Honorable Albert J. Engel, wrote a very
thorough 32-page opinion finding for plaintiff and
against Little Giant only, in the sum of $37,863.
Shortly thereafter, both plaintiff and Little Giant
moved for new trials or modification of the judg-
ment. After a full hearing, the trial court modified
its former judgment, reducing the damages to
$33,345.49.

The undisputed facts are well stated in the trial
court's opinions, and we summarize them. Plaintiff
was in the business of reclaiming, handling, and
hauling scrap metal for several firms in and near
Muskegon, Michigan. He also served customers by
loading, unloading, and hauling tubing and pipe.
Plaintiff owned a 1956 Lorain self-propelled 4 x 6
crane and a 1951 Unit self-propelled 4 x 4 crane.
The first numeral indicates the number of power-
driven wheels, and the second numeral indicates the
total number of wheels on the crane. In early 1965,
plaintiff desired to purchase another Lorain crane
identical to the one he owned. He requested that

Great Lakes Equipment Company order it for him. They informed him this model was discontinued but they could get him a truck crane[1] within 6 to 8-1/2 months.

Subsequently, Mr. Hartman, representative of Great Lakes, and Mr. Williams, representative of Little Giant, met with plaintiff concerning purchase of a crane. Plaintiff explained he wanted a self-propelled 4 x 6 crane like his Lorain, but narrower so it could be driven over the highway, and also he would like the boom to be five feet longer and still do the work that he was doing with his Lorain. Mr. Williams observed plaintiff's operations and talked with the operator of plaintiff's Lorain. Mr. Williams first tried selling plaintiff their regular 4 x 4 model, but plaintiff would not have it. Mr. Williams returned to his headquarters and later contacted plaintiff and informed him they would manufacture a 4 x 6 crane as desired in about 30 to 45 days. Mr. Williams said it would be as operative and do the same work that the Lorain was doing—as well or better. The plaintiff entered into a purchase agreement with Little Giant for the crane described including a 54-inch magnet for $43,805. It was delivered to plaintiff on or about July 1, 1965, and a man from Little Giant accompanied the crane at the time of delivery. Donald Schmiedeknecht, plaintiff's operator, drove the crane to Lakey's Foundry. A great deal of noise was encountered in the motor and in the clutches; otherwise, it worked well until the next day when the operator had trouble getting it over some soft sand. Finally it was necessary to have it pushed by a bulldozer. To correct this defect, another gear was installed. It was unlike the Lorain in that it

---

[1] A truck crane has two engines, one for powering the crane and one for moving the crane.

was necessary for the operator to get out of the cab and onto the ground in order to shift it into the new gear. The noise in the motor remained and although softer linings were installed in two of the clutches in 1966, the screeching continued. A six-foot muffler was also installed but without significant lessening of noise. The Little Giant crane was only powered up and not down, whereas the Lorain had power both ways. This situation impeded all close work with the crane. Two additional sheaves were installed in the rigging to give greater control but even this failed to bring the control to the degree obtained in the Lorain. Safety glass was substituted for ordinary glass in the cab and a better operator's seat was also installed. The stability of the Little Giant was not as good as the Lorain's but, of course, the boom was five feet longer and the Little Giant was narrower. The facts concerning the basis for the revocation of acceptance by plaintiff are well stated by the trial judge in his written opinion, *viz.*:

"The remainder of the proofs in the case, aside from the issue of damages, devolves upon the mechanical operation of the power train of the Little Giant crane. The difficulties actually encountered are largely undisputed although the parties draw sharply differing conclusions as to the cause and seriousness of them. In general, the plaintiff has claimed that the successive failures of the power train from time to time were brought about by instability in the mounting of it within the unit and that taken as a whole, they are indicative of what was finally concluded by plaintiff to be a substantial defect in design which could not ever satisfactorily be resolved and which thus finally triggered the decision to revoke acceptance. On the other hand, the defendant Little Giant in general characterizes the series of difficulties as independent and

isolated problems, each capable of correction in an otherwise completely acceptable piece of equipment. It was also inferred, at least by Little Giant, that much of the difficulty was due to improper maintenance and abuse of the machine by plaintiff's operator and maintenance man. However, none of the defendant's witnesses was able to point out in what way any claim of poor maintenance affected the particular breakdown. With respect to the final breakdown, however, there was at least an inference that if the breakdown was caused by a brake lock or having the tires stuck in ice, the same ought to have been avoided by a careful operator. More of that later.

"In September of 1965, the Little Giant Crane developed gear trouble in the vertical drive assembly. It was necessary to tow the crane back to Great Lakes for repairs which took approximately three weeks. Jack Heglin, Little Giant's serviceman, came to Muskegon from Iowa and the work which he performed on October 4, 5, 7, and 8 is outlined in Little Giant's exhibit 11. In short, it was found at that time that two gears at the top of the vertical drive shaft had failed to mesh and were thus chipped and broken. A further check also revealed that the lower bevel gears were also broken and chipped although both upper and lower pinion gears were undamaged. By this time, there had been a number of complaints by plaintiff's operator and by Little Giant service people that the verdical drive shaft assembly was 'wallowing', which the court understands is a particular form of vibration and movement. Mr. Schmiedeknecht had already complained that it was necessary to tighten the bolts on the assembly daily and in his inspection of the assembly on October 7, 1965, serviceman Heglin reported to his company that the pinion shaft had quite a bit of end play, that the nuts on both ends were loose, and that the bearing end was 'real loose'. These he tightened up in addi-

tion to the other repairs set forth in Little Giant exhibit 11. On the first day back after these repairs, Uganski's operator commenced to use it, but had only moved the machinery about two feet when the same difficulty immediately developed. Great Lakes brought out a wrecker or winch truck and had the crane once more brought in. Under the direction of Ollie Rudicil, mechanic for Great Lakes, they took the pedestal out, and discovered that the two lower bevel gears had gone out. The entire vertical drive assembly was thereupon sent back to Little Giant. Richard Abell of Little Giant testified that on October 25, the entire transmission was returned to Des Moines, fully assembled, where it was broken down. They discovered there the same as what was discovered in Muskegon: that the lower bevel gears were out of mesh and broken. They further found metal particles in the oil. Both gears were thereupon replaced. It was Mr. Abell's opinion that the second failure was the manufacturer's error, having installed the wrong bevel pinion spacing washer. At the same time, Little Giant also installed a new key and drilled and tapped six additional screw holes in the base of the vertical shaft housing tube in addition to the six already there. It developed from the testimony of Little Giant's president and Mr. Richard Abell that a previous modification in the standard 4 x 4 machine had not been incorporated into the 4 x 6. This modification called for the use of 12 instead of 6 bolts in attaching the vertical shaft housing to the lower transmission case. Meanwhile, with the approval of Little Giant, Great Lakes' mechanics had further sought to strengthen the vertical drive shaft by fabricating and installing a heavy metal brace which attached about the vertical shaft housing tube and secured it to the lower frame. Numerous other adjustments, modifications, and repairs were made both by Little Giant and by Great Lakes during the fall of 1965 in addition to what has

already been mentioned. Suffice it to say that sometime after November 8, 1965, the crane was delivered back to Uganski whose operator continued in the use of the machine until April 29, 1966 of the final breakdown.    *    *    *

"On April 29, 1966, Donald Schmiedeknecht was operating the Little Giant Crane at the Chevlin scrap yard. He had been working since approximately 7 a.m. loading car bodies and had not been required to move the crane more than 10 or 12 feet during the operation. It was being operated on the middle of the road of the scrap yard which was packed hard with no loose sand. At about 1 or 2 o'clock that afternoon, as he was going to drive the crane ahead, he heard air blow out and the machine thereafter refused to go either forward or backward. A mechanic from Inner-City was called for assistance. They took the top plate of the lower gear case off and observed that the rotary seal was twisted off. Since the machine could not otherwise be moved, the mechanic knocked some pins loose so that it could move freely. The plate was put back on, but only a couple of bolts were replaced since it was expected that the mechanism would have to be disassembled later for repair.

*    *    *

"A description of what actually occurred in the final breakdown is extremely difficult for a layman to understand and express, but the effort should be made. As described earlier, the 4 x 6 SP 48 consists of an upper structure and a lower structure. The upper structure contains the engine and all of the component parts necessary to the operation of the crane and boom itself. The lower structure is designed to give the entire unit mobility over the ground. In contrast to a truck crane which has two separate motors, the self-propelled SP 48 has but one engine which furnishes the power both for the operation of the crane and winches and for the

operation of the self-propelled mechanism in the lower structure. Thus, it is necessary that power be transmitted from the upper structure to the self-propelling wheels in the lower structure. This is done through the vertical drive shaft assembly and related parts. Inside the vertical shaft housing, (which is supposed to stabilize the transmission of power from the upper structure to the lower), is the drive shaft itself. This, of course, must get its power from the engine and rotate, transmitting the power to the gears below and thus through various drives to the wheels. There are two basic ways of securing the drive shaft to the gears below, one by the use of a spline and the other by the use of a key. The latter method was employed by Little Giant. The vertical drive shaft is hollow and within it and remaining stationary is a component known as the quill. It is the purpose of the quill to transmit under pressure both air and oil from the upper structure to the lower structure in order to assist in the lubrication and in the operation of the brakes and other parts requiring same in the lower structure.

"The breakdown occurred when the key connecting the drive shaft to the lower gear mechanism fractured or broke and there was likewise, at the same point, a fracture of the drive shaft at the end and in the area of the slot where the key fitted into the drive shaft. It is fairly apparent that the cracking of the drive shaft caused the fractured part of the shaft in some way to be pushed inward and against the quill creating a bind and thus causing the quill to twist instead of remaining stationary. As can be seen on Little Giant's exhibit 15, the quill tubes were thus twisted and broken and the air and oil pressure were immediately shut off from the lower propelling mechanism."

Plaintiff notified defendant-appellant on June 17, 1966, of his election to rescind the purchase and

offered to return the machine to them upon receipt of the purchase price plus damages suffered as a result of the breached express and implied warranties. This was refused by the defendant-appellant.

Plaintiff kept the crane at Muskegon until August 30, 1968, when it was sold for $8,500 to Little Giant who subsequently returned it to its plant at Sioux City, Iowa.

Defendant-appellant presents several issues on appeal which we restate and deal with in order.

## I

Were any express or implied warranties made by Little Giant incident to making the verbal contract with plaintiff Uganski for the purchase of the Little Giant crane?

The trial court in its opinion stated:

"There is little doubt in the court's mind that Little Giant is a reputable manufacturer of cranes, with much experience in the field. The only conclusion to be drawn is that Little Giant in good faith believed that it could modify an existing model which it had and sell the same to plaintiff and that in doing so, it could meet the express warranties required and could deliver the machine which would be good for plaintiff's purposes.

\*    \*    \*

"Finding, as the court does, that there was a breach of both implied warranty of merchantability and express warranty of fitness for a particular purpose, the case then reduces itself to what remedy or remedies the buyer, Mr. Uganski, has against whom, and for what damages."

The provisions of the Uniform Commercial Code governing express warranties provide as follows:

"(1) Express warranties by the seller are created as follows:

"(a) *Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.*

\* \* \*

"(2) *It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee'* or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." MCLA § 440.2313 (Stat Ann 1964 Rev § 19.2313). (Emphasis supplied.)

Mr. Williams of Little Giant agreed to furnish a crane that would do the work that the Lorain crane was doing as well or better. Mr. Uganski was specific in requiring a crane comparable to the Lorain in design and capability. Mr. Williams observed the Lorain working and talked with plaintiff's operator who pointed out the features of the Lorain crane. It is clear that, under the facts in this case, unless Little Giant had agreed to build a crane as good or better than the Lorain crane, and fit for the purpose and needs of plaintiff Uganski, there would not have been a sale by Little Giant nor a purchase by plaintiff Uganski. The evidence in the record substantiates the trial judge's finding of a breach of express warranty.

The implied warranty statute, MCLA § 440.2314 (Stat Ann 1964 Rev § 19.2314), provides in part:

"(1) Unless excluded or modified (section 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is

a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

"(2) Goods to be merchantable must be at least such as

"(a) pass without objection in the trade under the contract description; and

\*    \*    \*

"(c) are fit for the ordinary purposes for which such goods are used;  \*  \*  \*  ."

Was the crane "fit for the ordinary purposes for which such goods are used"? The difficulties that plaintiff experienced in using the crane and the many breakdowns including the final breakdown occasioned during the time that the crane was in use constituted sufficient evidence that it was not fit for the purposes for which it was used. The trial judge was correct in finding a breach of implied warranty.

## II

Were Uganski's rights altered by the terms of Little Giant's written standard warranty?

It is clear that a seller may limit or disclaim warranties if he complies with § 2316 of the Code (MCLA § 440.2316 [Stat Ann 1964 Rev § 19.2316]).[2]

---

[2] "(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence (section 2202) negation or limitation is inoperative to the extent that such construction is unreasonable.

"(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.' "

Defendant-appellant concedes that the Little Giant standard warranty contained in the maintenance and parts manual was not made known or delivered to Uganski at the time the crane was ordered or prior to the delivery of the crane.

The trial judge in his opinion stated relative to this issue:

"The foregoing being the case, what of Little Giant's claim that its liability is restricted to the warranty contained in the parts book, (LG exhibit 6) wherein Little Giant warrants all products manufactured by it to be free from defects in material and workmanship for a period of 120 days from the date of original retail sale, provided machine or product has not been demonstrated, modified or altered. The evidence is conclusive that whatever the impact of that warranty otherwise, it was not made known to either Great Lakes or to Uganski at the time of the sale. It only arose sometime after original delivery of the machine to Uganski when the parts book was finally furnished. This is confirmed by all witnesses and the check list was signed by serviceman Jack Heglin. The report of July 1, 1965, does not indicate that instruction book had been explained to the operator. This was essentially an oral transaction in which a sale was made accompanied by delivery.

"The Court agrees with the authority cited by Plaintiff in this respect and is of the opinion that Little Giant cannot later limit its liability when no such limitations were made at the time of the sale."

The case of *Mack Trucks of Arkansas, Inc.* v. *Jet Asphalt & Rock Co.* (1969), 246 Ark 101 (437 SW2d 459) is applicable to this issue. It is stated p 109:

"The very purpose of the statutory requirement [that disclaimer of implied warranties be conspicuous] is that any limitation be brought to the atten-

tion of the buyer at the time the contract is made. An attempted limitation at the time of delivery long after a contract to purchase is signed does not accomplish this purpose, being a unilateral attempt of a party to limit its obligations."

The case of *Mattson* v. *General Motors Corporation* (1968), 9 Mich App 473, cited by appellant is not applicable. This Court stated on p 474:

"At the time of the sale Mr. Mattson read the following new car warranty."

It is indicated by the quotation of the terms of the warranty that Mr. Mattson read the warranty in full. The reading coincided with the making of the contract and thereby became part of the contract. In the instant case, the written warranty was not made known to the plaintiff and was contained in a manual delivered some time after delivery of the crane. Appellant further claims that plaintiff, by accepting free service and parts for 120 days as provided in the written guarantee, accepted its terms. The difficulty with this argument is the lack of any showing that either plaintiff or defendant-appellant relied on the written warranty during the period of time that service and repairs were made to the crane. Also, appellant repaired and serviced the crane without charge after the expiration of the 120 days. The written warranty under the facts in this case was not applicable.

### III

Is there sufficient evidence in the record to support the trial court's finding that the power train of the Little Giant crane was improperly designed?

In addition to the findings of fact made by the trial judge, we point out that considerable difficulty

had been experienced with the power train of the subject crane as opposed to no difficulty with the power train in the Lorain.

The design of the power train of the Lorain differed from that of the Little Giant in two important respects: (1) There was greater support at the top of the vertical drive shaft. The upper transfer case of the Lorain was much larger and was bolted directly on all sides onto the frame of the crane itself. It afforded greater strength and stability to the top of the vertical drive shaft assembly. As manufactured, the highest stabilizing point on the vertical drive shaft of the Little Giant crane was the collared bolt to the top of the transmission case at the base of the shaft. This collar was originally affixed with only six bolts rather than the twelve called for by the specifications. Even after repairs had been made to the power train there still remained a movement or "wallowing" in the vertical drive shaft assembly. There was evidence that without a complete redesigning of the power train, the difficulty could not be cured. (2) The Little Giant did not have the strength of the Lorain at the base of the vertical drive shaft. Uganski's Lorain and other units utilized the spline shaft for transmitting power from the drive shaft to the lower bevel gear. Mr. Hartman testified that manufacturers generally liked to point out that they use a spline shaft rather than keys and keyways. A spline shaft provides a greater number of bearing surfaces between the gear and the shaft and, therefore, provides greater surface contact and greater strength at this critical point of juncture, rather than the one single keyway or three-part design employed by Little Giant. The transmission of power from the vertical drive shaft to the lower

bevel gear relates to the mobile power of the crane, not to the lifting power. This fact is particularly important in view of plaintiff's operational environment.

Because the crane was the only one of its kind manufactured by Little Giant to fulfill a particular defined need, together with the evidence of many breakdowns and difficulties in operating the crane, we conclude that there was a lack of adequate study and proper engineering and testing by Little Giant.

It is true that defendant-appellant's expert witness, Mr. Wandling, was the only expert witness offered and his opinion was to the effect that the power train of the Little Giant was properly engineered and designed. Appellant asserts that expert testimony, having been offered by Little Giant, could only be rebutted by expert testimony, and that in the absence of expert testimony on behalf of the plaintiff, the defendant must prevail. We do not agree. The rule in Michigan is set forth in the case of *Vial* v. *Vial* (1963), 369 Mich 534, 537:

"Indeed, no trier or triers of fact are bound to accept opinion testimony, however expert and authoritative, as they proceed to determine issues of fact duly committed to them for finding or verdict. The reason is that opinion testimony is not of the highest order since, as pointed out in *McNally* .v. *Colwell* (1892), 91 Mich 527, 536 (30 Am St Rep 494), 'a man's opinion cannot be met and tested, as could his testimony to the existence of a fact.'"

We also point out that Mr. Wandling performed no tests on the vertical drive shaft itself nor did he examine the crane for changes in structure between October, 1968, and the time of his observation prior to trial in April, 1969.

We conclude that there was sufficient valid evidence to support the finding of the trial court that

the power train of the Little Giant crane was improperly designed.

## IV

Did plaintiff's notice of revocation of acceptance on June 17, 1966, constitute a failure to give such notice within a reasonable time, under MCLA § 440.2608 (Stat Ann 1964 Rev § 19.2608), as a matter of law?

MCLA § 440.2608 (Stat Ann 1964 Rev § 19.2608) provides as follows:

"(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it."

In the Official UCC Comment, No. 4, p 604[3] it is stated:

"4. Subsection (2) requires notification of revocation of acceptance within a reasonable time after discovery of the grounds for such revocation. Since this remedy will be generally resorted to only after attempts at adjustment have failed, the reasonable time period should extend in most cases beyond the time in which notification of breach must be given, beyond the time for discovery of non-conformity after acceptance and beyond the time for rejection after tender. The parties may by their agreement limit the time for notification under this section, but the same sanctions and considerations apply to such agreements as are discussed in the comment on manner and effect of rightful rejection."

The final breakdown occurred April 29, 1966. Great Lakes informed plaintiff that it could not

---

[3] MCLA § 440.2608 (Stat Ann 1964 Rev § 19.2608, p 401).

guarantee that the crane would operate properly even if they repaired it. Notice of revocation of acceptance was then given defendant-appellant by plaintiff on June 17, 1966.

The subject of this lawsuit is a highly complex piece of heavy equipment which cost $43,805. Until the final breakdown, assurances had been made that the difficulties encountered with the crane would be corrected. Plaintiff was financially unable to purchase a substitute crane. Plaintiff was led to believe that Little Giant would send a representative to discuss with him efforts toward correcting the problems with the Little Giant crane. This meeting never took place. It is evident that plaintiff had relied on the assurances of defendant-appellant and worked with them until it became apparent that nothing further would be done to make the crane operative as promised.

Defendant-appellant cites the case of *MacLaren* v. *Dermody White Truck Company* (1968), 9 Mich App 402, as controlling on the question of "what constitutes reasonable time?" In *MacLaren* this Court stated, p 405:

"[T]hat what is a 'reasonable time' differs according to the circumstances of the particular case."

The facts in the instant case differ from those in the *MacLaren* case in that the truck in *MacLaren* was fully operable at the date of the attempted rescission. No repairs were made to the truck by seller between May 14 and July 1, the date of repossession by seller. An additional 9,000 miles of use were put on it by buyer during this period. On this basis, the *MacLaren* Court found (p 407) that:

"the cases cited by plaintiffs, which leave to a jury the determination of the reasonableness of the rescission *where the problem with the vehicle clear-*

*ly continued to exist at the date of the rescission, are not applicable."* (Emphasis supplied.)

Here, the problems which gave rise to the revocation of acceptance clearly continued to exist at the date thereof. Further, the *MacLaren* trial court concluded that the period between the date of repossession (July 1) and the attempted rescission (July 18) was also an unreasonable delay. The Court stated, p 407:

"that this conclusion was properly arrived at by examining plaintiffs' relations with Dermody after May 14."

In short, the seller having taken the initiative in *MacLaren* and repossessed for nonpayment, it was unreasonable for the buyer to wait 18 days before taking any counter action by attempting rescission whereby he might recover his $3,500 equity.

Herein, the question of timeliness of the notice of revocation was properly for the trial judge as trier of the facts. He found as follows:

"In less complicated mechanisms, with fewer reassurances, and with less at stake, it might be said that the delay in revoking acceptance on the part of Mr. Uganski was not timely. Within the framework of the evidence in this case, however, the court concludes that the notice of election to rescind, which is the same as revocation of acceptance under the Commercial Code, was given to the sellers within a reasonable time."

In reviewing the evidence, we cannot say that this determination of the trial court was clearly erroneous. GCR 1963, 517.1.

## V

We combine three issues of defendant-appellant and consider them together. Did plaintiff pro-

duce sufficient competent evidence to provide a reasonable basis for computing loss of profits, incidental or consequential damages, and was plaintiff entitled to damages for periods of time when he was unable to use the crane because of necessary repairs to make the crane operable?

Defendant-appellant apparently does not contest the right of plaintiff to recover consequential damages,[4] if properly proven. Appellant does question the sufficiency of the evidence. In defendant's brief for the trial court it is stated:

"It appears that identically the same measure of damages is involved whether the case be viewed as one for breach of warranty or for rescission. It seems fruitless, then, to enter upon a debate as to whether or not the plaintiff lost his right to rescind or revoke his acceptance since the controlling issue is whether or not there ever was a warranty, expressed or implied, and if so, whether or not such a warranty, express or implied, was breached."

The Little Giant did not have the same type of motor that was on the Lorain and this resulted in much greater noise in the crane's operation; the clutches on the Little Giant crane screeched loudly when used whereas the clutches in the Lorain did not so screech; and the Little Giant did not provide down power whereas the Lorain did so provide. The trial judge found these to be breaches of warranty. We conclude that while the crane was used by plaintiff that damages were properly awarded for such breaches of warranty. We also point out that the Great Lakes Equipment Company spent considerable time in making repairs to the crane, approximately 300 hours of labor from July 1, 1965, to January, 1966.

---

4 MCLA § 440.2715 (Stat Ann 1964 Rev § 19.2715).

The question of loss of profits is one of fact and loss of profits is a proper element of damages in contract cases. *Atkinson* v. *Morse* (1886), 63 Mich 276. The certainty required in the proofs for consequential damages is stated in the Official UCC Comment, No. 4, p 745 to MCLA § 440.2715 (Stat Ann 1964 Rev § 19.2715, p 440):

"4. The burden of proving the extent of loss incurred by way of consequential damage is on the buyer, but the section on liberal administration of remedies rejects any doctrine of certainty which requires almost mathematical precision in the proof of loss. Loss may be determined in any manner which is reasonable under the circumstances."

In the case of *Godwin* v. *Ace Iron & Metal Company* (1965), 376 Mich 360, 368, it is stated:

" 'But where injury to some degree is found, we do not preclude recovery for lack of precise proof. We do the best we can with what we have. We do not, "in the assessment of damages, require a mathematical precision in situations of injury where, from the very nature of the circumstances, precision is unattainable." ' "

Also see *Allison* v. *Chandler* (1863), 11 Mich 542.

The plaintiff had been in the same business for many years. Based on over 25 years of experience in the truck and crane business and knowledge of available work in 1965 and 1966, Uganski testified that had the Little Giant crane been as warranted to him, he could have grossed an *additional* $100,000 a year over what he actually realized, from which he would have had a net profit of between $15,000 and $16,000. His opinion testimony was properly admitted by the trial court over defendant Little Giant's objection. Opinion testimony of the owner of a business and other persons familiar with his

operation as to the amount of damages he suffered
by way of lost profits has been held admissible by
this Court. *Redinger* v. *Standard Oil Company*
(1967), 6 Mich App 74. The amount of net profit
derivable from such additional gross income was
corroborated by his accountant's compilation of the
ratio of net profits to his gross earnings from his
truck and crane operations. The 15–16% ratio of
net profit to gross revenue derived from this com-
pilation for the six-year period of 1963 through
1968 takes into account the cost of acquiring and
maintaining trucks and other accessory equipment
for the hauling of salvage obtained by the cranes.
The work to be performed was consistent with
Uganski's basic operations. At the time he pur-
chased the Little Giant crane, Uganski had more
work available than he could perform with his exist-
ing equipment and could have kept the Little Giant
employed full time.

The plaintiff also testified and it was undisputed
that he received $10 per hour for the use of a crane,
and that he paid an operator $2.50 per hour. He
testified that the crane could have been operating
50 hours per week. Such loss on this basis would
approximate $1,500 per month. The down time
while repairs were being made was properly in-
cluded in ascertaining loss of profits. According
to the amended judgment, $9,300 was awarded as
total consequential damages which we conclude was
within the range of the evidence. The trial judge
credited defendant-appellant with $6,300 for the 940
logged hours the crane was operated by plaintiff.
Although this sum does not allow for $7.50 per
hour, we conclude that it was close enough to the
correct figure when we consider some of the hours
were used in transporting the crane to repair loca-
tions. We cannot say that the trial court's finding

is clearly erroneous. GCR 1963, 517.1. The credit given to defendant-appellant of $4,250 for the magnet retained by the plaintiff is not in dispute.

## VI

May the price obtained on the sale of the Little Giant crane on August 30, 1968, serve as evidence of market value of the crane at the time of notice of revocation of acceptance?

We turn to the law on revocation of acceptance, MCLA § 440.2711 (Stat Ann 1964 Rev § 19.2711) which provides in part:

"(3) On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller (section 2706)."

MCLA § 440.2706 (Stat Ann 1964 Rev § 19.2706) provides in part:

"(2) Except as otherwise provided in subsection (3) or unless otherwise agreed resale may be at public or private sale including sale by way of one or more contracts to sell or of identification to an existing contract of the seller. Sale may be as a unit or in parcels and at any time and place and on any terms but every aspect of the sale including the method, manner, time, place and terms must be commercially reasonable. The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach."

Plaintiff elected to sell the crane at public auction under the provisions of MCLA § 440.2706(4) (Stat

Ann 1964 Rev § 19.2706[4]); however, he delayed in making the sale for a period of two years and two months from the date of notice of revocation of acceptance. The defendant-appellant, in the trial court and here, asserts that the delay and the failure of the plaintiff to properly care for the crane during the waiting period made the sale not commercially reasonable.

The trial judge in his opinion found:

"The sale, to be commercially reasonable within the meaning of the statute, ought to have been made at an earlier date and it might be said that plaintiff was tardy by two years in finally making up his mind to auction the crane off."

The trial court, having found that the more than two-year delay in the sale of the crane required a finding that it was not commercially reasonable, proceeded to add the sum of $1,000 to the sale price obtained ($8,500) to compensate for the unreasonable delay. We have searched the record and are unable to find any evidence to justify a finding that the crane's true cash value on the date of the notice of revocation of acceptance was $9,500. The burden is upon plaintiff to prove that the price received on the resale of property is its fair market value when the sale has been unreasonably delayed. See 130 ALR 1336. We conclude that the absence of evidence that the resale price together with the compensatory $1,000 represented the fair value of the crane at the time of revocation of acceptance forbids our affirming this portion of the judgment.

The following appears in 44 ALR 296, p 330:

*"The price received on a resale unreasonably delayed is not binding upon the purchaser for the purpose of fixing the seller's damages, and if there is no other evidence of the market value at the time*

*of the breach, or of the seller's loss, other than the
amount received from the resale, the jury are not
warranted in giving the seller substantial damages.
Alden Speare's Sons Co. v. Hubinger* (1904), 64
CCA 68 (129 F 538)." (Emphasis supplied.)

Now it is true that Little Giant purchased the
crane at the public sale and thereby placed itself
in a position to salvage part of the damages it is
required to pay to plaintiff. This is not sufficient
reason to relieve the plaintiff of the requirement
to sustain his burden of proof as to value or to
excuse his delay in selling the crane.

The trial judge may have considered that the sum
of $1,000 would compensate for depreciation of the
crane over the two-year delay period or that the
$1,000 would represent the decrease in value of the
crane from June, 1966 to August, 1968. In either
event, there is no evidence in the record to substan-
tiate either theory. We are therefore constrained
to reverse this part of the judgment and to remand
to the Circuit Court for Muskegon County for fur-
ther proceedings to determine the value of the crane
at the time of the notice of revocation of acceptance.
When determined, this figure will take the place
of the $9,500 (sale price plus $1,000) used by the
trial court in assessing damages in its final judg-
ment.

Affirmed in part and reversed in part. No costs,
neither party prevailing fully.

All concurred.