Calvin C. DRIER, d/b/a Rural Press,
Plaintiff and Respondent,

v.

PERFECTION, INC., a corporation,
Defendant and Appellant,

and

American Type Founders, a corporation,
and Whitin Machine Works, Inc., a cor-
poration, Defendants and Appellants.

Calvin C. DRIER, d/b/a Rural
Press, Plaintiff,

v.

PERFECTION, INC., a corporation,
Defendant and Respondent,

and

American Type Founders, a corporation,
and Whitin Machine Works, a corpora-
tion, Defendants and Appellants.

Nos. 11905, 11907 and 12078.

Supreme Court of South Dakota.

Argued March 25, 1977.

Decided Nov. 4, 1977.

Rehearing Denied Dec. 2, 1977.

Gale E. Fisher of May, Johnson & Burke, Sioux Falls, for plaintiff and respondent.

Robert Heege of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendants and appellants American Type Founders and Whitin Machine Works, Inc.

A. D. Sommervold of Woods, Fuller, Shultz & Smith, Sioux Falls, for defendant and appellant and respondent Perfection, Inc.

DUNN, Chief Justice.

This is an action for breach of implied and express warranties made in the sale of a printing press in which a jury in the Second Judicial Circuit Court returned a verdict of $14,200 against Perfection, Inc. and American Type Founders, a division of Whitin Machine Works (Whitin).[1] At a later date, the trial court granted indemnity to Perfection for any sums due to the plaintiff and awarded it the amount of $11,047 (the price Perfection had paid for the press) plus 6% interest, payable on return of the title to the press to Whitin. Whitin and Perfection have appealed these judgments. We affirm the judgment of the jury verdict, but reverse the judgment as to the granting of indemnity and the return of the press.

Calvin Drier, the plaintiff herein, had been involved in the printing business most of his life and owned a print shop in Tea, South Dakota. In the fall of 1973, he sent two employees to Perfection, Inc. in Minneapolis to look at a Profiteer 25–1 press, manufactured by Whitin, which Drier had read ads for in printing trade journals. The two were not able to observe the press actually printing, but they observed it as paper was fed into the machine. They also observed a Royal Zenith press in full operation.

After the employees returned, Gale Libby, Perfection's president (Libby), visited Drier's shop and observed his printing needs. Libby advised Drier that the Profiteer 25–1 would be more suitable for his purposes than the Royal Zenith. Based on his study of the material supplied by Whitin on the press, Drier bought the Profiteer and traded in two of his smaller presses, leaving him with only one press other than the Profiteer.

The press was shipped directly from the manufacturer in Whitinsville, Massachusetts, and arrived in Tea about March 18, 1974. Perfection dispatched Dick Synsteby to erect the press and get it running, but he ran into trouble in his efforts. Nine defects were found immediately and Drier wrote to the president of Whitin informing him of them. These specific defects were corrected by Synsteby with the assistance of a conference call from Whitin's quality control people, but the press was still not printing properly when he left.

1. For purposes of this appeal, American Type Founders and Whitin will be treated as being one party, and when we speak of Whitin, we mean both AFT and Whitin.

Drier continued to have "toning" problems, and finally on April 29, 1974, he demanded that Perfection remove the machine. Libby suggested that Jim Elder look at the press to see what could be done. Elder was a former Whitin employee who had helped design the Profiteer. When Drier agreed, Elder was hired by Whitin and Perfection to look at the press. On initial examination, Elder, in a moment of excitement and frustration, said the machine was "junk" and would have to be rebuilt or replaced. Elder later met with Libby and changed his opinion, stating that replacement of some soft cams would remedy the problems with the press. Elder did not testify at the trial.

After Elder had done what he could, Libby and Drier met and Libby promised he would "make it print and * * * stand behind that one hundred percent." In return, he wanted Drier to sign a security agreement since Perfection had received no money for the press. The agreement contained the following disclaimer in bold, black capital letters:

"SELLER MAKES NO WARRANTIES, EXPRESS OR IMPLIED AND NO REPRESENTATIONS, PROMISES OR STATEMENTS TO BUYER WITH REFERENCE TO THE PROPERTY UNLESS EXPRESSLY SET FORTH HEREIN, AND SELLER EXPRESSLY EXCLUDES ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS."

Drier signed the agreement and made seven monthly payments of $359.21 before stopping payment.

After the agreement was signed, Drier continued to have trouble with the press and was attempting to get Libby to have it repaired. Synsteby, the erector, returned several times but did not succeed in getting it to work properly. He stated to Drier's employees that he had to re-do so many things that were normally done at the factory that he could not assume anything had been done right by Whitin. Synsteby did not testify at the trial either.

About two weeks after the agreement was signed, Whitin sent Bruce Cooper, a "troubleshooter," to replace some cams in the press. After he left, a spring broke and the press would not work for awhile.

Drier finally "covered" by buying a $2,800 press to do some of his printing work. He testified that he had paid overtime wages of $4,798.70 to get the work done, and he spent 100 hours of his own time trying to fix the press. He also testified that he had lost profits of $2,588.14 on jobs he had to "job out" to other printers.

He sued Perfection and Whitin, asking for $46,358.22 in damages. Perfection counterclaimed for Drier's alleged default in his installment payments and cross claimed, denying that any of its acts or omissions resulted in the defects, if any existed, and asked for indemnity from Whitin for any recovery had against it and such other relief as the court might deem advisable. Whitin claimed that the court had no jurisdiction over it and that no facts on which relief could be granted had been alleged. It also made a general denial to the amended complaint and the cross claim.

At trial, the plaintiff presented evidence to the jury of damages totaling $19,965.56, which consisted of his cash down payment, his trade-in presses, seven installment payments, freight and erection costs, his "cover" purchase of another press, his overtime payments, and his loss of earnings. The jury in response to interrogatories found as follows:

(1) Perfection made and breached an express warranty to the plaintiff;
(2) Whitin made and breached an express warranty to plaintiff;
(3) Whitin breached an implied warranty of merchantability; and
(4) Perfection did not breach any implied warranties.

Judgment in the amount of $14,200 was entered December 12, 1975.

In findings of fact and conclusions of law filed September 29, 1976, the court found the defendants had agreed to allow it to determine the cross claim. Judgment was entered granting Perfection indemnity for

any sums due plaintiff from Whitin and also awarding Perfection $11,047 (the price it had paid Whitin for the press) plus 6% interest against Whitin. Title to the press was ordered transferred to Whitin when the money was paid. Whitin and Perfection appeal from the judgment on the jury verdict, and Whitin appeals from the judgment of the trial court in favor of Perfection.

The first question to be answered in resolving these appeals is whether appellant Whitin is subject to this court's jurisdiction. At issue is South Dakota's "long-arm" statute, SDCL 15–7–2, which provides in part:

"Any person is subject to the jurisdiction of the courts of this state as to any cause of action arising from the doing * * * of any of the following acts:
(1) The transaction of any business within the state * * *."

That statute was discussed extensively by this court in *Ventling v. Kraft*, 1968, 83 S.D. 465, 161 N.W.2d 29, and the court ruled that the legislature, by enacting this "long-arm" statute, "intended to provide South Dakota residents with maximum protection of South Dakota courts" from injury by nonresidents "when that nonresident has had the necessary minimal contacts with the state to comply with federal due process." 161 N.W.2d at 34.

■ It is not necessary to reiterate the detailed history of the statute that was laid out in *Ventling*; it is sufficient to state that the court examined the line of United States Supreme Court cases beginning with *International Shoe Co. v. State of Washington*, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, and extracted three rules for guidance in future litigation. These rules are:

"(1) The nonresident defendant must purposefully do some act or consummate some transaction in the forum state. * * * (2) The cause of action must be one which arises out of, or results from, the activities of the defendant within the forum. * * * (3) The assumption of jurisdiction by the forum state must

not offend traditional notions of fair play and substantial justice. In the determination of the latter, consideration should be given to the quality, nature and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded to the respective parties, and the basic equities of the situation." 83 S.D. at 471, 161 N.W.2d at 32.

The court stated that these were not strict rules of application and that the problem is "essentially * * * a question of fundamental fairness."

■ The record reveals that Whitin had the following contacts with South Dakota:
(1) A distribution agreement with Perfection, Inc. to market its products in this state;
(2) The press was sent directly from Whitin to plaintiff's plant in Tea, South Dakota;
(3) Whitin paid half of the cost of sending expert Jim Elder to South Dakota to examine the press for defects;
(4) Whitin advertised its press in trade journals which came to South Dakota;
(5) A brochure describing the press was given by Whitin to Perfection, Inc. to give to customers;
(6) Whitin corresponded by mail and telephone with plaintiff at his place of work in South Dakota; and
(7) Whitin sent its "troubleshooter," Bruce Cooper, to South Dakota to work on the press.

These acts were purposefully done in this state and some or all of them form the basis for the action brought by Calvin Drier.

In keeping with the legislative intent to provide maximum protection to our citizens within the boundaries of due process, we hold that Whitin is subject to the jurisdiction of the courts of South Dakota.

■ In deciding whether sufficient evidence exists to support the making of an

express warranty by Perfection and express and implied warranties by Whitin, it is important to view the facts as two separate sales. The first was from Whitin to Perfection with delivery made to Drier's place of business in Tea, South Dakota. The second was the purchase by Drier from Perfection which included the security agreement containing a disclaimer of warranties.

SDCL 57–4–26 provides:

"Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

Exhibit 1, the Profiteer 25–1 brochure, was printed by Whitin and sent to its distributor for circulation among the industry. It contained the following affirmations:

(1) Paper sizes from 8″ × 10″ to 19″ × 25¼″;

(2) Thickness from 9 lb. onion skin to 6 ply card stock;

(3) Speeds to 8500 impressions per hour;

(4) Superior inking system and precise inking controls.

These statements described the specific capacity of the goods and certainly amounted to more than mere "puffing" or opinion. *Burke v. Thomas Chevrolet*, 1975, S.D., 227 N.W.2d 31; *Swenson v. Chevron Chemical Co.*, 1975, S.D., 234 N.W.2d 38. The law is clear that express warranties may be made in advertisements, pamphlets or brochures. *Hawkins Construction Co., Inc. v. Matthews Co., Inc.*, 1973, 190 Neb. 546, 209 N.W.2d 643. We hold that Whitin made express warranties of the above facts.

■ As to an implied warranty of merchantability, SDCL 57–4–30 states that "unless excluded or modified" a warranty of merchantability is implied if the seller is a merchant dealing in those goods." There was no exclusion or modification of any warranties in the sale from Whitin to Perfection, so an implied warranty of merchantability was created.

■ According to SDCL 57–4–41, a seller's express and implied warranties extend "to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty." Since Whitin delivered the press to Rural Press in Tea, it certainly could reasonably expect that Drier would use the press, so the warranties given to Perfection extended to Drier. There is evidence to support the lower court's conclusion that Whitin had made express warranties and an implied warranty of merchantability to Perfection and Drier.

■ The transaction between Perfection and Drier is complicated by the existence of a security agreement signed by Drier which contains a waiver of warranties in bold, black capital letters. Witnesses testified that Libby told Drier that, *if he would sign the agreement*, "I will make it print, and I will stand behind that one hundred percent." There is no question that this statement was a promise which formed part of the basis of the bargain, thus creating an express warranty.

■ Perfection contends, however, that it was error to allow this testimony, alleging that all prior negotiations were merged into the written document. SDCL 57–3–4, the parol evidence rule, is cited as the basis for Perfection's position. It reads:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(1) By course of dealing or usage of trade * * * or by course of performance * * * and

(2) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

The key to application of this provision is "a writing intended by the parties as a final

expression of their agreement * * *." The trial court must make a finding of finality before this section will apply. *Shore Line Properties, Inc. v. Deer-o-Paints and Chemicals, Ltd.*, 1975, 24 Ariz.App. 331, 538 P.2d 760, 763; *Braund, Inc. v. White*, 1971, Alaska, 486 P.2d 50, 56; White and Summers, Uniform Commercial Code, Sec. 12–4, 354. SDCL 57–4–34 makes words or conduct tending to negate or limit an express warranty inoperative, subject to the parol evidence rule. Since that rule does not apply to a writing where no final expression was intended, any words which limit the express warranty to "make it print" are inoperative. We need not discuss whether the disclaimer was sufficient to waive the implied warranty of merchantability, since the jury found that Perfection had not breached such a warranty. There was a sufficient basis, however, to justify the finding of an express warranty on the part of Perfection.

Whitin next maintains that the trial court erred in allowing exhibit 18 into evidence. This was a letter from Drier to the president of Whitin, detailing the defects in the press and implying that he had received a "factory second" from Whitin, along with other conclusions and opinions about the press. It is undisputed that each of the defects specifically listed in the letter was corrected and does not form the basis for any breach of warranty.

■ We agree with plaintiff that *Ehlers v. Chrysler Motor Corporation*, 1975, S.D., 226 N.W.2d 157, governs our ruling in this matter. In *Ehlers*, a letter was sent by a disgruntled purchaser of an automobile to the manufacturer outlining the problems he had experienced with the car and giving his conclusions and opinions about these problems. The letter was ruled admissible to show that notice of the defect was given to the seller. SDCL 57–7–15(1) provides that the buyer must notify the seller of any breach or be barred from recovery. The notice of defects must be given within a reasonable time after discovery. *Vander Eyk v. Bones*, 1958, 77 S.D. 345, 91 N.W.2d 897; SDCL 57–7–21.

■ Drier's letter was written shortly after delivery of the press and was admissible to show that notice of defects had been given. The pleadings raised the issue of notice, and the letter was relevant to show that notice was given. It is clear from reading exhibit 18 that the nine listed defects were only the "obvious" ones, and that Drier was giving notice as to other defects which were not as obvious as the ones he listed. Any prejudice which might have resulted from allowing the letter to be admitted and read to the jury was balanced out by the presentation of evidence that all the specifically listed defects had been corrected.

Counsel for Whitin states that this alleged error "seems so obvious as to not require citations of authority." At another point in his brief, he states that "[o]ther evidentiary rulings * * * are equally erroneous and, if standing alone, might not require reversal, but the cumulative effects of all such errors cannot lead to any conclusion other than Whitin was prejudiced." This is the same type of argument presented in *Shaffer v. Honeywell, Inc.*, 1976, S.D., 249 N.W.2d 251, wherein this court commented:

"The rulings of the trial court are presumptively correct; we have no duty to seek reasons to reverse. The party alleging error must show such error affirmatively by the record. Not only must error be demonstrated but it must also be shown to be prejudicial error. There is no affirmative showing of prejudicial error in this instance. An assignment of error not briefed or argued is deemed abandoned." (citations omitted) 249 N.W.2d at 258.

■ Whitin and Perfection raise as a fourth point of error the fact that plaintiff did not present any expert testimony as to defects in the press to counter testimony of Libby that the press was doing a satisfactory job. We do not agree that there was no expert testimony on the plaintiff's part. The record shows that Drier had been a pressman or pressman's assistant constantly since 1955. He was given a printer's certif-

icate in the military without even having to complete printing school, and, after leaving the service, he ran all sizes of presses at different places of employment. He has owned his own print shop since 1967. Based on these facts, the trial court was justified in allowing Drier to give his expert opinion as to the problems with the printing press. *State ex rel. Helgerson v. Riiff,* 1950, 73 S.D. 467, 475, 44 N.W.2d 126, 130; *Engberg v. Ford Motor Co.,* 1973, 87 S.D. 196, 205 N.W.2d 104.

Related to this issue is the contention that the finding of a defect was based purely on speculation and conjecture. Several other possible causes for the printing problems other than a defective press were listed in the brief of Whitin. The burden of proof is on the plaintiff to show that there was a defect in the product at a time when the defendant had possession, control or responsibility for the condition of the product. A product is defective when it fails to perform reasonably and safely the function for which it was intended. No specific defect need be shown if the evidence, direct or circumstantial, permits the inference that the problem was caused by a defect. *Shaffer v. Honeywell, supra; Engberg v. Ford Motor Co.,* 1973, 87 S.D. 196, 205 N.W.2d 104. A defect may be inferred from proof that the product did not perform as intended by the manufacturer, and expert testimony is of great value in establishing defectiveness. *Herman v. General Irrigation Co.,* 1976, N.D., 247 N.W.2d 472, 478–479.

Drier testified as to spoilage of the paper, toning problems, inability to get the press to work and failure of the press to print at the speed warranted in the manufacturer's brochures. This testimony, coupled with that of Jim Elder, that the press was a "piece of junk," which will be discussed later, was sufficient to allow the jury to infer the existence of a defect. Mere suggestion of other possible causes does not make the plaintiff's theory speculative. *Klein v. Hodgmen & Sons, Inc.,* 1957, 77 S.D. 64, 85 N.W.2d 289; *Engberg v. Ford Motor Co., supra.*

The jury was confronted with two experts, each saying a different thing. "Acceptance or rejection of the expert testimony of either was a matter for the jury and their determination will not be disturbed." *Engberg v. Ford Motor Co.,* 87 S.D. at 201, 205 N.W.2d at 107.

We will next deal with the alleged error arising from the statements of Drier and his employees as to Jim Elder's opinion of the quality of the press, as well as that of Dick Synsteby. Libby testified that Elder was a former employee of Whitin who was "closely associated" with the Profiteer Press and "knew it very well." He characterized Elder as "well-qualified to examine and to pass judgment on the equipment." Elder was paid by Whitin and Perfection to examine the press in question and "give his opinion of its condition and operability." He had authority to make modifications to get the press running properly.

Although he was not called to testify, witnesses stated that upon examining the machine, Elder "got real excited and said that Whitin had done this before and then he went on to tell me how it was junk and that it would have to be replaced or rebuilt." This statement was clearly hearsay, and, absent one of the traditional exceptions, should not have been allowed into evidence. We feel the statement was admissible under the doctrine set forth in *La Rue v. St. Anthony & D. Elevator Co.,* 1893, 3 S.D. 637, 54 N.W. 806. Elder had ostensible authority to give his opinion of the press. SDCL 59–3–3. Even if no actual agency existed, the facts show that an ostensible agency existed in the eyes of Drier. SDCL 51–1–5. In *La Rue,* this court stated the general rule as to the admissibility of an agent's statements:

"The statements * * * must have been made by the agent at the time of the transaction, and either while he was actually engaged in the performance or so soon thereafter as to be in reality a part of the transaction; or, to use the common expression, they must have been part of the 'res gestae.'" 3 S.D. at 642, 54 N.W. at 807.

Elder's statements were made during his examination of the press and are admissible under this doctrine as well as the exception to the hearsay rule. The trial court did not err in allowing Elder's statements into the record.

■ The rule set forth in *La Rue*, supra, would also apply to allow the statements of Dick Synsteby into evidence. The record shows that during the course of his efforts to make the press print, Synsteby told Drier's employees that there were so many things he had to re-do which should have been done at the factory he could not assume that Whitin had done anything it was supposed to do.

Libby testified that Synsteby had worked for him for twenty years and that there weren't many problems that he could not solve with regard to printing presses. When asked, he agreed that Synsteby was "very capable." Since Synsteby was qualified to give his opinion as to the press, his hearsay statement would be admissible against Perfection under the doctrine set out in *La Rue*, supra, and *Jungworth v. Chicago, Minneapolis & St. Paul Ry. Co.*, 1909, 24 S.D. 342, 123 N.W. 695. Although the statement probably should not have been admitted against Whitin, we find any error was harmless in view of the other evidence of defect.

■ Upon a finding that these statements were admissible, a further question arises as to whether hearsay statements, even though admissible, can be used to show the existence of the facts commented on in the statements. These statements are opinions given about the defects in the press, and there is some dispute as to whether they should be admissible as such. McCormick indicates that the traditional view is to treat out-of-court opinion testimony just as in-court opinion testimony would be treated. Using this view, we feel both men were sufficiently qualified to give opinion testimony as to printing problems. The increasing trend is to treat out-of-court opinion testimony more liberally than in-court testimony, which would also indicate that the testimony should be admitted.

Under either theory, the testimony is not inadmissible because it was opinion testimony. McCormick on Evidence, § 18 (E. Cleary Ed., 2d Ed., 1972), p. 41.

■ Whitin and Perfection raise two points of alleged error with regard to the damages issue. The first point deals with Drier's testimony as to the amount of overtime and lost profits resulting from the breach of warranty. Exhibit 25 was a summary used by him of overtime wages paid to employees for the period when the press was malfunctioning. It was compiled from a large number of documents at Drier's place of business. Perfection contends that the original documents on which the summary was based were never produced in court or made available to them as required by *Hotovec v. Howe*, 1961, 79 S.D. 337, 111 N.W.2d 748. The record is vague and contradictory, but it does indicate that they knew the records would be used by Drier at the time his deposition was taken, and Drier was willing to make them available for future depositions. During the trial, the judge ordered that the documents be brought into court the next day. It is not clear whether they were brought in, but if they were not, we feel Whitin and Perfection should have preserved their record better for purposes of appeal. If the court's order was disobeyed, Whitin and Perfection should have made that fact known to the trial court and requested further court action. In view of the fact that they were aware of the records at the discovery stage and apparently could have had access to them on request, we hold that the summary was admissible to show the overtime wages paid.

■ The testimony of Drier as to lost profits was based on his review of "work jackets" for various jobs he had to "job-out" to other printers, as well as other records in his office. The trial court ordered them brought to court the following day, and, at that time, Drier testified that he lost $10,786 worth of business and his net profit would have been 24%. No objection was made, either as to foundation or lack of availability of the documents, at the

time of this testimony; the record of error was not preserved, and allowing the testimony to be admitted was not reversible error.

Although the record is admittedly vague, it is our conclusion that the overtime summary and the testimony based on the "work jackets" and other records were admissible under *Hotovec v. Howe,* supra, and *Peter Kiewit Sons' Co. v. Summit Construction Co.,* 1969, 8 Cir., 422 F.2d 242. This leaves the question of whether the testimony, by itself, was too speculative to allow an award of consequential damages.

■■■■ The basis for recovery of lost profits is SDCL 57–8–40, allowing consequential damages from the seller's breach. Comment 4 to the corresponding U.C.C., § 2–715, states that the burden of proof of consequential damages is on the buyer, but mathematical certainty is not required. "Loss may be determined in any manner which is reasonable under the circumstances." This court has articulated a "reasonable certainty" test concerning the proof needed to establish a right to recover damages:

> "While the nature of the case may not permit estimating damages with certainty, it is the rule in this state that the matter of measuring damages may not be left to mere speculation on the part of the jury. Facts must exist and be shown by the evidence which afford a basis for measuring the loss of the plaintiff with reasonable certainty." *Kressly v. Theberge,* 1961, 79 S.D. 386, 112 N.W.2d 232; *Peter Kiewit Sons' Co. v. Summit Construction Co.,* 1969, 8 Cir., 422 F.2d 242, 261.

In a Michigan case involving a defective crane, the court allowed testimony similar to Drier's, stating:

> "The plaintiff had been in the same business for many years. Based on over 25 years of experience in the truck and crane business and knowledge of availa-

ble work in 1965 and 1966, Uganski testified that had the Little Giant crane been as warranted to him, he could have grossed an additional $100,000 a year over what he actually realized, from which he would have made a net profit of between $15,000 and $16,000. His opinion testimony was properly admitted by the trial court over defendant Little Giant's objection." *Uganski v. Little Giant Crane & Shovel, Inc.,* 1971, 35 Mich.App. 88, 192 N.W.2d 580, 590–591.

An Oklahoma court allowed an operator of a swine feed lot who sued for breach of warranty on some bulk storage tanks to testify to the number of swine he expected to feed as compared with the number he actually did· feed because of the defective tanks. He was allowed to give his testimony as to the net profit lost on each head of swine he was unable to feed. *J. R. Boring v. Geis Irrigation Co.,* 1976, Okl.App., 547 P.2d 988, 992.

On the other hand, applying South Dakota law, the United States Court of Appeals for the Eighth Circuit found evidence of consequential damages too speculative in *Karlen v. Butler Manufacturing Co.,* 1975, 526 F.2d 1373. A breach of warranty for a grain storage building was involved, and the plaintiff testified that he utilized the stored wheat to "balance out" his taxes, selling in December or January, depending on whether he needed the income or not.[2] The court held this to be too speculative without some corroboration from records of the plaintiff. It cited White and Summers' statement that "a defendant is not liable for a million dollars merely because the plaintiff testified 'if this machine hadn't broken down, I might have made a million dollars last year.' "[3]

■■■■ We believe Drier did more than merely testify that he might have made a certain amount in profits. His testimony was based on his other job records. Since Whitin and Perfection had access to the

---

**2.** This was relevant because he was trying to show that he would have held the grain until the end of the year if the storage bins would have been as warranted.

**3.** White & Summers Uniform Commercial Code, pp. 321–322.

foundational documents, as we read the admittedly vague record, they could have challenged Drier's estimates on cross-examination, but did not do so. Loss of profits may be recovered if the evidence shows with reasonable certainty both their occurrence and the extent thereof. *Gerwin v. Southeastern California Ass'n of Seventh Day Adventists,* 1971, 14 Cal.App.3d 209, 223, 92 Cal.Rptr. 111, 119. The testimony of Drier satisfied these requirements.

Appellants claim error from the allowing of testimony by plaintiff as to the amount of business done with Perfection, and as to his conversations with various attorneys he sought out after deciding to sue. Reception into evidence of exhibit 7, which was an example of a printing job printed by plaintiff on a press other than the Profiteer, is also alleged to be error. Exhibit 7 was shown as an example of the kind of work the Profiteer should have been able to handle had it been working properly.

■■■■ The law affords no specific or definite test for determining when evidence is immaterial, conjectural or remote. The question must be left to the practical judgment of the trial court and rests largely in its discretion. *Pautz v. American Insurance,* 1964, 268 Minn. 241, 128 N.W.2d 731. We find no abuse of such discretion here. Whitin and Perfection are estopped from challenging admission of conversations plaintiff had with his attorney by the fact that they first questioned plaintiff as to such conversations and activities. *Grist v. Upjohn Co.,* 1969, 16 Mich.App. 452, 168 N.W.2d 389; 31A C.J.S. Evidence § 190, pp. 509–512; Wigmore on Evidence, 3rd Ed., § 15.

Several points of alleged error are raised in regard to instructions to the jury. Some of these are based on allegations of error in the evidentiary rulings and these have been answered earlier in this opinion.

We have examined the other assignments of error in regard to instructions and find them without merit. The instructions when considered as a whole, give a full and accurate statement of the law applicable to the facts in this case. *Dwyer v. Christensen,* 1958, 77 S.D. 381, 92 N.W.2d 199.

Finally, we are confronted with the indemnity issue. As stated, subsequent to the jury verdict in favor of Drier, the trial court ruled that the defendants had agreed to allow it to determine the cross claim. The court found in its findings of fact that Perfection, using "due care and competent personnel" was unable to make the printing press operate because of the defective parts and workmanship of said printing press as manufactured by Whitin. It then found as a matter of law that Whitin had breached an implied warranty of merchantability and that the defective parts and workmanship substantially impaired its value to Perfection, allowing Perfection to revoke its acceptance. Indemnity was granted and the purchase price was ordered returned to Perfection with title to the press returned to Whitin.

■■■■ The granting of indemnity was erroneous. We agree that it is the general rule that a retailer or other seller suffering and paying judgment against him by an injured party in a warranty action is entitled to indemnity from the manufacturer who sold the product to him with a similar warranty. *Herman v. General Irrigation Co.,* 1976, N.D., 247 N.W.2d 472, 479. That rule applies in situations where a plaintiff seeks recovery under an implied warranty of merchantability, in which case the retailer merely acts as a conduit.

■■■■ This case, however, involves an express warranty by Perfection to "make it work." The Washington Supreme Court was confronted with a very similar situation involving a warranty on a truck engine, and had this to say:

" * * * Fageol made an express warranty under which it promised to make all repairs necessary. This warranty was independent from any agreement entered into between the plaintiff and Cummins. The trial court predicated the defendants' liability on the fact that they both had made express warranties to repair the truck; they both were given an opportunity to fulfill their respective warranty,

and they both failed to do so, which proximately resulted in the plaintiff's damages. Therefore, in the absence of a separate contract for indemnification between Fageol and Cummins, there is no basis for imposing the entire burden of liability on the manufacturer * * *." *Schroeder v. Fageol Motors, Inc.,* 1975, 86 Wash.2d 256, 544 P.2d 20, 25.

Perfection had an opportunity to fulfill its express warranty and its failure to do so proximately resulted in the plaintiff's damages. Under those circumstances, the manufacturer should not have to bear the entire burden. The judgment of the trial court on the indemnity issue is reversed.

The trial court also allowed Perfection to rescind the contract and receive the payment price in return. This determination was made based on its conclusion of law that a breach of an implied warranty had occurred. We hold this conclusion was erroneous and lacked support in the record.

 Mr. Libby testified that, "the press was in sound mechanical condition after replacement of the cams." It is settled law in South Dakota that a party to a lawsuit cannot claim the benefit of a version of relevant facts more favorable to his own contentions than he has given in his own testimony. *Miller v. Stevens,* 1934, 63 S.D. 10, 256 N.W. 152; *Harris v. Midwest Oil Company,* 1940, 67 S.D. 300, 292 N.W. 397; *Lenker v. Musilek,* 1953, 75 S.D. 60, 59 N.W.2d 417; *Ford v. Robinson,* 1957, 76 S.D. 457, 80 N.W.2d 471; *Johnson v. Norfolk,* 1957, 76 S.D. 565, 82 N.W.2d 656. The court in *Miller,* supra, summarized the rule as follows:

"An examination of the decisions reveals that when a party testifies to positive and definite facts which, if true, would defeat his right to recover or conclusively show his liability, and such statements are not subsequently modified or explained by him so as to show that he was mistaken although testifying in good faith, it has generally been held that he is conclusively bound by his own testimony, and cannot successfully complain if he is non-suited or the court directs a verdict against him." 63 S.D. at 16, 256 N.W. at 155.

Thus, although required to view the facts in the light most favorable to Perfection, we are still bound by the facts as shown in the testimony of Perfection. Taking Perfection's version of the facts, as testified to by Libby, Whitin is not liable to Perfection for the price paid on the printing press, and Perfection is not entitled to revoke its acceptance of the press.

The judgment of the jury in favor of plaintiff is affirmed, and the judgment of the trial court as to the granting of indemnity and the right to revoke the contract in favor of Perfection is reversed.

WOLLMAN and ZASTROW, JJ., concur.

PORTER and MORGAN, JJ., concur in part and dissent in part.

PORTER, Justice (concurring in part, dissenting in part).

INDEMNITY

Perfection and Whitin agreed that the trial court should determine the indemnity issue by applying the facts expressly and impliedly found by the jury verdict. In essence, these parties waived a jury on the indemnity issue, and agreed that the trial court could, consistent with the jury verdict, make findings of fact and conclusions of law upon which the court should then render judgment as to Perfection's cross-claim for indemnity from Whitin.

The trial court found that the failure of the printing press to operate was caused by the defective parts and workmanship of the press, as manufactured by Whitin, notwithstanding the attempt of Perfection, using due care and competent personnel, to make the press operate. The findings of fact exculpate Perfection and inculpate Whitin as the sole cause of the failure of the press to operate, and thus necessarily as the sole cause of plaintiff's damages.

Indemnity for Perfection against Whitin can be adjudged on at least two grounds. (1) The trial court concluded that Whitin breached its implied warranty of merchantability to Perfection. Plaintiff's money judgment against Perfection is a detriment to Perfection proximately caused by Whitin's breach of its warranty to Perfection, for which Perfection is entitled to be indemnified. *First National Bank of Arizona v. Otis Elevator Co.*, 2 Ariz.App. 80, 406 P.2d 430 (1965); reh. den., 2 Ariz.App. 596, 411 P.2d 34 (1966). (2) Perfection may be compelled to pay money to plaintiff which in justice Whitin ought to pay, and Perfection's entitlement to indemnity is not barred by conduct on its part of a wrongful nature. See *First National Bank of Arizona v. Otis Elevator Co.*, supra. Perfection's unsuccessful efforts to make the press work should bar its right to indemnity only if there is a basis for finding that some act or omission of Perfection contributed to the cause of the damage and was independent of the damage caused by Whitin. In view of the findings of fact and conclusions of law of the trial court there is no basis for any such finding against Perfection.

I would distinguish *Schroeder v. Fageol Motors, Inc.*, 1975, 86 Wash.2d 256, 544 P.2d 20, 25, on the ground that it involved resale of a *used* truck.

### RESCISSION

In addition to awarding Perfection indemnity on its cross-claim against Whitin, the trial court also awarded Perfection a rescission of the purchase of the press by Perfection and adjudged that Whitin return the purchase price to Perfection upon Perfection's return of the press to Whitin. That part of the judgment upon Perfection's cross-claim was error. Perfection's cross-claim sought indemnity only, and it should not be held that the agreement between Whitin and Perfection to allow the trial court to apply the jury findings to the indemnity issue should be interpreted as a further agreement to allow the trial court to make findings and conclusions on an issue never tried, namely, the question of whether or not Perfection should or should not be entitled to rescind as against Whitin.

There was no evidence taken during the trial relative to Perfection's right to rescind as against Whitin, nor did the trial court take any such evidence after the jury trial concluded and before the trial court entered judgment upon the cross-claim. To allow the trial court to make findings and conclusions concerning rescission, under the circumstances here, deprived Whitin of an opportunity to present defenses pertinent to the issue of rescission as it would be entitled to do if the issue were presented by the pleadings. *American Property Services v. Barringer*, S.D., 256 N.W.2d 887 (1977).

### CONCLUSION

I. I concur in the opinion of the court affirming the judgment of plaintiff against Perfection and Whitin.

II. I respectfully dissent from the opinion of the court denying Perfection indemnity against Whitin, and would hold Perfection entitled to indemnity.

III. I concur in the opinion of the court reversing that part of the judgment in favor of Perfection against Whitin awarding Perfection rescission and return of the price, but concur only upon the grounds above stated.

I am authorized to state that Justice Morgan joins in this concurring and dissenting opinion.