Duane CUNDY, Plaintiff and Appellant,

v.

INTERNATIONAL TRENCHER SERVICE, INC., an Illinois Corporation, and Tri-State Sales, Inc., a Minnesota Corporation, Defendants and Appellees.

Nos. 14312, 14313.

Supreme Court of South Dakota.

Argued Feb. 13, 1984.

Decided Nov. 14, 1984.

Charles Rick Johnson of Johnson, Eklund & Davis, Gregory, for plaintiff and appellant Cundy.

Robert Anderson of May, Adam, Gerdes & Thompson, Pierre, for defendant and appellee Intern. Trencher Service, Inc.; Charles M. Thompson of May, Adam, Gerdes & Thompson, Pierre, on brief.

Robert D. Hofer of Riter, Mayer, Hofer & Riter, Pierre, for defendant and appellee Tri-State Sales, Inc.

HENDERSON, Justice.

This is a civil appeal involving the purchase of a trenching machine, the U.C.C. and the rights and obligations of the purchaser, dealer, and distributor thereunder.

From a judgment in favor of purchaser and against dealer in the amount of $30,000, and requiring $15,000 contribution from distributor, we affirm in part, reverse and remand in part.

Appellant, Duane Cundy (Cundy), instituted a lawsuit seeking revocation of acceptance and/or damages for breach of warranty on the purchase of a large trenching machine known as a Hoes Super Gigant. Both the distributor, International Trencher Service, Inc. (distributor) and Tri-State Sales, Inc. (dealer) were named as defendants. Dealer and distributor cross-claimed seeking indemnity or contribution for any judgment rendered against them individually. Dealer and distributor are both appellees, but dealer did not appear at argument or submit a brief in this Court.

The trial court rejected all proposed findings of fact and conclusions of law. Cundy's request for revocation was denied and the trial court proceeded to find liability against dealer on breach of warranty theories (express and implied). Damages of $20,000 were awarded for diminution of value of the machine and $10,000 consequential damages, all for a total judgment of $30,000. Distributor was required to contribute $15,000 of this amount on the cross-claim.

Cundy is an experienced trenching equipment operator. In the fall of 1979, his employer, Eatherly Constructors, Inc., informed him that he would have to increase production in order to keep his job. Others on the Eatherly project had been using a Super Gigant trencher machine. Cundy contacted dealer with the idea of either leasing or purchasing such a machine.

Immediately prior to purchase, Cundy received a brochure printed by distributor, describing the Super Gigant. On the brochure, an agent of dealer had written the following message: "Duane, This is big one we discussed. Also remember that the new ones have 325 HP as compared to 285 on the old ones. Daryl." There were no other written statements of warranty, though dealer's salesmen did tell Cundy at the time of purchase that the trencher had a six-month parts warranty.

The machine was delivered on June 25, 1980, with a warranty-delivery report which bore the letterhead "International Trencher Service, Inc." The report included the following language:

> The above machine has been properly set-up, serviced, and in good operating order when delivered to the customer.
>
> _____
> Dealer Signature, Date
> I accept delivery of the above machine and find it in good operating condition.
> Duane E. Cundy /s/
> Customer Signature, Date

In July 1980, dealer conducted a 50-hour checkup, at which time it was informed of some problems Cundy was having with the "float"[1] mechanism. The mechanic was unable to deal with the problem. No one from dealer nor from distributor pursued the matter until December 1981, one year after this litigation commenced.

From July 1980 through December 1980, Cundy experienced additional problems with the Super Gigant. There was a problem with the hydraulic front axle resulting in machine pausing[2] and difficulties with the trencher's vertical tilting mechanism.[3] Also, Cundy learned of a disparity in the actual horsepower of the trencher from a mechanic called in to repair the engine. Contrary to having a 330 H.P. SAE, this machine had only a 267 H.P. SAE.

Cundy made approximately twenty telephone calls to dealer between July and

---

**1.** The float mechanism is an electronic and hydraulic system which acts to keep the bottom of the trench level even though the machine may be going over rough terrain.

**2.** When trenching uphill, Cundy found the machine would suddenly pause, stop, and often roll backwards.

**3.** This mechanism is the hydraulic and electronic system which keeps the trencher vertical while going over rough terrain.

November 1980, seeking help in correcting his trencher problems. Pursuant to advice he received from dealer, he tried to remedy the pausing problems by changing the oil and filters on the hydraulic system, to no avail. Dealer also sent to him a new release valve to remedy the float malfunction, again to no avail. Cundy was further informed that dealer would not be responsible for problems due to owner's fault or to electrical problems.

Cundy was then referred to distributor. Between October and December of 1980, Cundy attempted to secure help with the trencher's pausing difficulties from distributor. Distributor likewise advised a change of oil and filters. This second attempt proved unsuccessful as well. Finally, distributor informed Cundy that they were not responsible and referred him back to dealer.

On December 8, 1980, Cundy notified dealer and distributor of his intent to revoke acceptance of the trencher and tender the machine back upon repayment of the purchase price, less reasonable rental. No response was forthcoming.

Cundy then attempted to sell the machine, but received no offers. He continued to use the machine during 1980 and 1981. Finally, in December 1981, one year after this action commenced, the president of distributor brought a mechanic from the parent company in Germany to inspect the trencher. A new front axle was installed, as well as several other parts, and the machine was cleaned, resulting in a cost of approximately $15,000, which was not billed to Cundy. The machine has been in working order since that time.

Cundy and distributor dispute the trial court's decision, requesting our disposition of several issues on appeal. We separately treat six issues below:

## I.

DO THE COURTS OF SOUTH DAKOTA HAVE JURISDICTION OVER INTERNATIONAL TRENCHER SERVICE, INC.?

■ Distributor claims that the South Dakota courts lack jurisdiction over it because none of the prerequisites of SDCL 15–7–2 have been met. This same issue was raised in *Drier v. Perfection, Inc.*, 259 N.W.2d 496 (S.D.1977), in which three rules were set forth as a guide in litigation involving jurisdictional questions:

"(1) The nonresident defendant must purposefully do some act or consummate some transaction in the forum state. * * * (2) The cause of action must be one which arises out of, or results from, the activities of the defendant within the forum. * * * (3) The assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice. In the determination of the latter, consideration should be given to the quality, nature and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded to the respective parties, and the basic equities of the situation."

*Drier*, 259 N.W.2d at 501 (citing *Ventling v. Kraft*, 83 S.D. 465, 471, 161 N.W.2d 29, 32 (1968)).

Citing *Drier* as authority, the trial court found

the following grounds, inter alia, [sufficient to] subject ITS to … jurisdiction of South Dakota courts: defendants executed a dealer-distributor agreement whereby Tri-State would market, service, and provide warranty work for ITS in South Dakota; pursuant to Ms. Poznanovich's [sic] [President of ITS] efforts and directives, she secured the services of Mr. Arno Steiner, an expert mechanic from Hoes International, Inc., of Germany, who examined and worked on plaintiff's trencher in Mitchell, South Dakota, during December of 1981; Mr. Adams, an employee of ITS, accompanied Mr. Steiner and Ms. Poznanovich [sic] … to Mitchell, South Dakota, where the plaintiff's trencher was examined and re-

paired pursuant to Ms. Poznanovich's [sic] directives; the Hoes brochure describing the trencher was distributed by ITS to Tri-State, which thereafter gave the brochure to plaintiff; ITS, by and through its employees engaged in telephonic conversations with plaintiff who lived and worked in South Dakota during the time in question; and ITS sent its service manager, Mr. Adams, to work on plaintiff's trencher.

*Drier* found sufficient minimal contacts for jurisdiction based on substantially similar factors. Applying its findings to the settled law of the state, the trial court is correct in holding that a finding of jurisdiction is "[i]n keeping with the legislative intent to provide maximum protection to our citizens within the boundaries of due process ...." *Drier*, 259 N.W.2d at 501.

## II.

DID THE TRIAL COURT ERR IN ITS CONCLUSION THAT CUNDY'S REQUEST FOR REVOCATION OF ACCEPTANCE WAS INAPPROPRIATE IN THIS CASE?

■ Cundy insists the trial court erred in not allowing revocation of acceptance of the trencher, particularly as no reasons for this refusal are set forth anywhere in the trial court's decision. The trial court simply concluded the remedy of Revocation of Acceptance was inappropriate in the instant case. We find there is sufficient evidence to support the trial court's conclusion.

SDCL 57A–2–608(1) provides:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

  (a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

  (b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

"As conditions precedent to revocation of acceptance it must first be shown (1) that the goods are nonconforming and (2) that such nonconformity substantially impairs the value of the goods to the buyer." 4 Anderson, *Uniform Commercial Code* § 2–608:4, at 171–72 (3rd ed. 1983). "What constitutes substantial impairment is, of course, a factual determination to be made by the trier of fact. Although the term 'substantial impairment' may not be susceptible of being precisely defined, surely it connotes more than merely minor, easily repairable defects in the goods." *Schumaker v. Ivers*, 90 S.D. 75, 81, 238 N.W.2d 284, 287 (1976) (citation omitted). "When the goods are not fit for their normal use and will not function or work as they were sold to do, the impairment of the value of the contract is substantial and the buyer may revoke acceptance." *Anderson*, § 2–608:24, at 187–88.

The trial court found that the trencher was nonconforming in that it was rated 267 H.P. SAE and not 330, as warranted, plus the machine experienced several mechanical malfunctions and defects. However, there was not sufficient indication that these problems *substantially* impaired the value of the trencher to Cundy. This becomes particularly apparent in light of the fact that as of date of trial, the machine had been repaired and has continued to function properly since. This is unlike the situation in *Schumaker*, upon which Cundy so heavily relies, where all attempts at repair failed continuously. Further, contrary to Cundy's claims that the rate of horsepower had a direct correlation to his production, there was evidence indicating that low production experiences may have been due to other factors.

"Although there were conflicts in the testimony concerning the exact nature of the defects ... it was for the trial court to weigh this testimony and determine whether the defects were of such *magnitude* as to warrant plaintiffs in revoking their acceptance ...." *Schumaker*, 90 S.D. at 82–83, 238 N.W.2d at 288 (emphasis supplied). Though the trial court did not set out specific reasons for its decision, the facts

borne out in the record, in the incorporated memorandum opinion, and in the findings of fact, support the view that no substantial impairment occurred. Therefore, revocation of acceptance was inappropriate.

### III.

### DID THE TRIAL COURT ERR IN ITS GRANT OF CONSEQUENTIAL DAMAGES?

The trial court awarded Cundy $10,-000 consequential damages for lost profits. Cundy argues that this award is insufficient and does not adequately cover his consequential losses for the period in question. Distributor, on the other hand, contends that any award of consequential damages was improper.

There is no question that incidental and consequential damages may be awarded in a proper case. SDCL 57A–2–714 and SDCL 57A–2–715. Cundy insists that his testimony stating that defects in the machine cost him fifty miles of production in 1980 and again in 1981, is sufficient for an award based on that mileage, relying heavily on *Drier* for this proposition. *Drier* held that "[l]oss of profits may be recovered if the evidence shows with reasonable certainty both their occurrence and the extent thereof." 259 N.W.2d at 507. However, in that case, "Drier did more than merely testify that he might have made a certain amount in profits. His testimony was based on his other job records" and was substantiated by sufficient foundational documents of which appellants had access. *Drier*, 259 N.W.2d at 506.

Further, the issue with regard to the present award is not evidence of the loss; the trial court specifically noted such loss. The production differential between Cundy and another Super Gigant trencher operator is set forth in the trial court's findings of fact, as well as Cundy's income, less costs and expenses for those years. The issue here is a conflict in the evidence with regard to causation. "In order for a buyer to recover a loss item as consequential damages it is necessary for the buyer to establish that the loss in question was caused by the breach by the seller. 'Consequential damages are recoverable if they are the direct, immediate and probable result of the breach.'" *Anderson*, § 2–715:7, at 503.

Cundy claims an award of consequential damages due to the fact that his production for the years 1980–81 averaged fifty miles less per year than another individual working the same project with an identical machine. This fact is not disputed. However, as stated previously, there was testimony to the effect that this loss of production may not have been due entirely to breaches of express and implied warranties, and, in fact, may have been due, in part, to operator experience and poor work habits.

Still, because there was evidence to suggest that some of the problems experienced by Cundy were caused by defective machine parts, an award was not absolutely precluded. Therefore, we find no error in the trial court's award, and limitation, of consequential damages. However, the $10,000 figure does appear to be quite arbitrary. We fail to see upon what factors this sum is based. We hazard not as to whether this figure might be substantially higher or lower. We therefore remand for evidence either substantiating the amount or establishing a new amount of the consequential damage award.

### IV.

### WAS THERE ERROR IN ALLOWING TRI–STATE CONTRIBUTION OR INDEMNITY AGAINST INTERNATIONAL TRENCHER SERVICE, INC.?

Pursuant to written agreement, the relationship between Tri-State and International Trencher Service is that of dealer/distributor. There is a warranty included in this agreement covering the sale of new equipment for a period of six months from the date of delivery. This warranty is limited by separate warranty policy to replacement of defective parts, determination of which is based on the judgment of distributor.

Finding Illinois law to be applicable pursuant to the agreement of the parties, the trial court determined that the agreement, warranty, and warranty limitation were all in accordance with the law of that state. The trial court particularly found Ill.Ann. Stat. ch. 26, § 2–719(2), at 601 (Smith-Hurd 1963), to be applicable to the cross-claims of distributor and dealer. That statute provides "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in [Article Two of the U.C.C.]." This application was based on an opinion that distributor's warranty limiting dealer's remedy to replacement of defective trencher parts has " 'failed of its essential purpose' due to [distributor's] dilatory and careless efforts in providing warranty parts and assistance thereunder." The court relied on several Illinois cases in support of the doctrine of "failure of essential purpose."

Distributor, upon Notice of Review, questions this determination. However, the trial court's finding is not without merit. Donna Paznanovich, president of distributor, testified to the warranty relationship; dealer would be responsible for all warranty work, distributor would provide parts. Yet, distributor decided when there was a warranty situation or not. When dealer's suggestions for repair failed, they referred Cundy directly to distributor. In all dealings with distributor, the concern was primarily on the pausing problems of the hydraulic front axle. Several Telex messages ensued between distributor and its parent company, Hoes of Germany. Messages from Hoes and distributor requested certain information from Cundy in order to diagnose the problem. There are indications on those messages that Cundy did not have the equipment or the expertise to provide the information and that he was hundreds of miles from anyone who could so provide. Distributor never went out to Cundy's work site to inspect the machine. It was their determination that the pausing problem was one of maintenance rather than material or workmanship and, thus,

was not under warranty. Distributor eventually referred Cundy back to dealer.

However, one year after this litigation commenced, in December 1981, Ms. Paznanovich, accompanied by Arno Steiner from Hoes of Germany and Rex Adams, distributor's service manager, did make a trip to inspect the trencher. At that time, the front axle was replaced, thereby finally alleviating the pausing. We uphold contribution herein with further explanation below.

## V.

DID THE TRIAL COURT, BY AWARDING CONTRIBUTION, AWARD CONSEQUENTIAL DAMAGES THROUGH THE BACK DOOR?

Distributor next contends that by requiring it to contribute via the trial court's decision, the trial court was able to award compensation indirectly in a manner not directly provided by law. Distributor is correct with regard to this contention. The trial court concluded that Cundy had no remedy against distributor for direct economic losses (i.e., consequential damages) because of a lack of privity of contract. Yet, in awarding contribution to dealer, a portion of that award was specifically attributable to Cundy's lost profits. The trial court indeed awarded consequential damages through the back door.

In its memorandum opinion, the trial court determined that a lack of privity barred recovery based on the holding of *Jandreau v. Sheesley Plumbing & Heating Co.*, 324 N.W.2d 266 (S.D.1982). Citing J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 11–5, at 407 (2d ed. 1980), *Jandreau*, 324 N.W.2d at 272, states:

"Where the buyer cannot show reliance on express representations by the remote seller ... [t]he majority of courts still appear to hold that absent such reliance, a non-privity buyer, whether commercial or consumer, cannot recover for direct economic loss on either an express or an implied warranty theory ...."

That case involved a defective irrigation system, purchased from Federal Irrigation, Inc., and installed by Sheesley Plumbing. Jandreau attempted to recover consequential damages from Sheesley, based on breach of alleged express warranties.

*Jandreau* is not applicable, however, as disposition of the damages issue ultimately rested on two basic facts: 1) a finding that no warranties were ever made by Sheesley and 2) Sheesley was at most a subcontractor hired by Federal to install the system— he was not a seller as defined by the U.C.C. Thus, the U.C.C. provisions applicable to "seller's warranties" were not applicable to that case and the discussion on privity was mere dicta.

It was decided in federal court on the basis of South Dakota law that "lack of privity is no defense in South Dakota in a breach of implied warranty action by a remote buyer against a manufacturer even though the buyer seeks only the recovery of damages for economic losses." *Horizons, Inc. v. Avco Corp.*, 551 F.Supp. 771, 777–78 (W.D.S.D.1982), *modified on other grounds*, 714 F.2d 862 (8th Cir.1983).

Acknowledging the rule of the majority as set out in White & Summers, the court in *Horizons* relied on SDCL 57A–2–318 and *Drier*, 259 N.W.2d 496, for deciding to the contrary. SDCL 57A–2–318 states:

A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section.

The court found it significant that upon adoption of Alternative C of U.C.C. 2–318, the limitation of warranty coverage to injuries "to the person" of a beneficiary, was omitted. *Drier* allowed recovery of consequential damages from the remote manufacturer of a printing press based on implied warranties.

The point is: The parts warranty between distributor and dealer should have extended to Cundy as a foreseeable user. Further, if the warranty limitation fails of its essential purpose with regard to dealer, then so also does it fail with regard to distributor. Therefore, it is not so clear that Cundy could not have recovered consequential damages directly from distributor. Regardless of this, however, *Drier* further stated the "general rule that a retailer or other seller suffering and paying judgment against him by an injured party in a warranty action is entitled to indemnity from the manufacturer who sold the product to him with a similar warranty." *Drier*, 259 N.W.2d at 507. Though the trial court's rationale may be incorrect, the result is certainly not, and we sustain it. Under these facts, the award of contribution was not improper.

## VI.

## SHOULD INTERNATIONAL TRENCHER SERVICE, INC., BE ALLOWED CREDIT FOR RESTORING THE MACHINE UNDER THE DOCTRINE OF RECOUPMENT?

■ Distributor argues it should be allowed credit for the $15,000 expended in repairing the trencher in December 1981, under the doctrine of recoupment. That doctrine does not seem to be applicable to these facts. However, the view that Cundy may be recovering double damages is not without merit.

The court awarded $20,000 damages for diminution of the value of the trencher. This figure was arrived at by determining the difference between the value of the trencher as warranted and the value of the machine as it was when delivered, and before repair. However, the machine has been repaired by distributor for the sum of $15,000, and Cundy concedes that it now is substantially the machine he purchased. (The trial court did not measure or award damages based on the horsepower of the engine.)

"When damages are awarded, the plaintiff should not be awarded damages twice for the same item nor be given a windfall." *Anderson*, § 2–714:15, at 481, citing *General Supply & Equip. Co., Inc. v. Phillips*,

490 S.W.2d 913 (Tex.Civ.App.1972). The measure of damages is ordinarily that used by the trial court "unless special circumstances show proximate damages of a different amount ...." *Carlson v. Rysavy*, 262 N.W.2d 27, 30 (S.D.1978). "If by reasonable expenditure goods may be made to conform to the warranty, the amount of such expenditure may be the measure of such damages." *Downs v. Shouse*, 18 Ariz.App. 225, 230, 501 P.2d 401, 406 (1972).

As the trencher ultimately proved repairable, the measure of damages should have been based on the cost of repair. Certainly, Cundy was at least partially compensated by the eventual repair of the trencher. We hence remand on the damages award.

We affirm in part and reverse and remand in part pursuant to the views expressed herein.

All the Justices concur.

DUNN, Retired Justice, participating.

WUEST, Circuit Judge, acting as Supreme Court Justice, not participating.