**HORIZONS, INC., Plaintiff,**

v.

**AVCO CORPORATION, Defendant.**

**No. CIV80–5079.**

United States District Court,
D. South Dakota, W.D.

Sept. 13, 1982.

772

## MEMORANDUM OPINION

BOGUE, Chief Judge.

This case was tried to the Court on January 25 and 26, 1982. This Court, having considered the evidence, oral arguments, and briefs of the parties, now makes and enters these Findings of Fact and Conclusions of Law. *See* Fed.R.Civ.P., Rule 52.

### FINDINGS OF FACT

1. Horizons, Inc. is a South Dakota corporation with its principal place of business in Rapid City, South Dakota. Horizons is in the business of providing aerial photographic and photogrammetric services, including topographic surveying and mapping.

2. Avco Corporation is incorporated in a state other than South Dakota. Avco/Lycoming, one of Avco's wholly-owned subsidiaries, manufactures and sells remanufactured engines for utility aircraft.

3. Avco does not sell its remanufactured engines directly to the public, but does so only through its authorized domestic distributors. *See,* Exhibit 66. Aviation Sales, Inc. is an authorized distributor of Avco in Denver, Colorado. Horizons originally contacted Aviation Sales concerning the purchase of a remanufactured engine. James Spell, president of Horizons, told management personnel at Aviation Sales the nature of Horizons' business. Those persons then requested that Horizons order the engine through a "fixed base operator," such as Casper Air Service, a dealer in Casper, Wyoming. In December, 1977, Horizons ordered an Avco remanufactured engine, type TIO–540–A2B, serial No. RL–162–61, from Casper Air Service. Horizons paid the purchase price of $12,767.00 for the engine.

4. When Horizons negotiated with Aviation Sales and Casper Air Service concerning the purchase, there was no discussion of the warranty, if any, which would cover the engine. When the engine was delivered to Horizons, in either December 1977, or January 1978, Exhibit 59, Avco's "Limited Standard Warranty," was inside a packet of materials attached to the engine. Robert Collett, of Horizons, filled out and mailed to

Wayne F. Gilbert, Rapid City, S.D., for plaintiff.

Ronald Clabaugh, Rapid City, S.D., for defendant.

Avco a warranty registration form which also was attached to the engine. Exhibit 59, and the contents thereof, were not bargained for as a basis for the contract for the sale of the engine.

5. The engine was installed in a Cessna 310 aircraft owned by Horizons about mid-June 1978. Horizons' employees discovered several problems with the engine during its installation and during pre-flight testing. These problems included fuel running from a fuel injector, and difficulties requiring replacement of the turboabsolute controller, condenser in the left magneto, and one intake pipe. Horizons contacted Aviation Sales concerning some of these problems. After the engine was installed and tested, Horizons personnel attempted to operate the aircraft. They experienced a series of mechanical failures and breakdowns due primarily to backfiring in the Avco engine. As a result of these difficulties, Horizons personnel expended numerous hours for both unscheduled maintenance and troubleshooting in an attempt to restore the engine to ordinary operating condition.

6. During July and August of 1978, Horizons attempted to operate its Cessna 310, with the Avco engine, in the course of its aerial photography business. Horizons also owned and utilized a Cessna 206 aircraft in its business. The Cessna 310, however, is capable of greater speed and altitude and may cover greater distances than may the Cessna 206. The Cessna 310 also carries more elaborate photographic equipment. During the 1978 flying season, the Cessna 206 was assigned to perform contracts in North and South Dakota, while the Cessna 310 was assigned to work in Montana, Wyoming and western South Dakota. Horizons had contract work available in 1978 for every day on which both planes were operable.

7. The aircraft engine, type TIO–540–A2B, serial No. RL–162–61, remanufactured by Avco and purchased by Horizons was not fit for the ordinary purposes of an engine of this type. The testimony at trial established that the engine was defective in that the exhaust valve guide on the No. 1 cylinder of the engine was internally "bell-shaped." The valve guide, therefore, could not make uniform contact with the No. 1 exhaust valve and could not properly conduct heat away from the valve. The valve became coated with carbon and would stick and operate erratically. Dr. Wilkov testified that the defective and erratic operation of the valve was further indicated by the presence of wear and burn marks on the No. 1 exhaust valve and by peens, or indentations on the cam which pushes the No. 1 exhaust valve. Dr. Wilkov also testified that these defects would impair the ability of the engine to reach and sustain an altitude of 24,000 feet and would cause the backfire problems experienced by Horizons. The defects significantly impaired Horizons's use of the Cessna 310 on contracts which required high altitude flights. The backfire and detonation problem precluded the achievement of the straight and level flight line required in aerial photography. The defect in the valve train of the engine existed at the time the engine was remanufactured and was not caused by normal engine wear.

8. Horizons notified Avco in writing of the malfunctioning of the engine. Prior to the written notice, Horizons personnel discussed the engine problems, by telephone, with Avco employees at the factory in Williamsport, Pennsylvania.

9. To correct the defects in the engine so that it could operate in a manner fit for its ordinary purposes, Horizons incurred expenses of $6,494.75, which constituted its reasonable expenses for parts, labor and services related to the repair and overhaul of the engine.[1] See Exhibits 9, 10, 25, 26, 27, 28.

10. Horizons accepted the Avco engine and never revoked its acceptance of the engine. SDCL 57A–2–606.

1. These costs of repair are, specifically:

| | | |
|---|---|---|
| Robert Collett labor (110.5 hours at $22.92) | $2,532.66 | |
| Casper Air Service parts (as claimed) | 3,512.91 | |
| Van Dusen parts | 314.14 | |
| Johnson Machine service bill | 107.61 | |
| B & L Aviation parts bill | 27.43 | |
| | | $6,494.75 |

11. Plaintiff claimed as incidental damages the additional cost to Horizons to install the engine. Horizons personnel testified that the ordinary amount of time required to install an engine of this type is 24 hours. Horizons' employees, however, required 46.4 hours to install the Avco engine. Thus, Horizons seeks to recover the labor cost of the 22.4 hours above the normal installation time. See, Exhibits 4, 7. Incidental damages must either result from the seller's breach or constitute an expense incident to the breach. SDCL 57A–2–715(1). For this reason, this Court required plaintiff to show that the additional installation time was caused by the defective condition of the engine, and not by some cause not related to the breach of warranty. Tr. 43–44. For most of the hours comprising this part of Horizons' claim, it failed to establish this causal connection. Collett testified, however, that during the installation and pre-flight testing, he had to replace a fuel injector, the turboabsolute controller, a condenser in the left magneto, and one intake pipe. These were not typical installation problems. In Exhibits 6 and 35, Horizons proved it worked on these specific problems on June 23, 1978, and spent seven hours in so doing. The cost to Horizons for this unnecessary and extraordinary installation and pre-flight testing time was $124.04. (Tr. 381; 7 hours × $17.72).

12. Horizons also established that it incurred expenses of $1,075.60 in attempting to inspect the engine and diagnose the defects in the engine. Horizons incurred labor costs of $17.72 for 60.7 hours of unscheduled maintenance and test flights during the period of July 8, 1978 to August 8, 1978. None of these "troubleshooting" hours would have been necessary if the engine had not been remanufactured in a defective manner, or if the engine had been fit for its ordinary purposes.

13. When Horizons was unable to determine the problem with the engine and was forced to abort some flights, it decided to remove, disassemble and inspect the engine. The disassembly and inspection was conducted at Air Craft Co. in Broomfield, Colorado. As a result of the defects in the engine, Horizons incurred the following reasonable expenses in connection with the disassembly and inspection:

| | | |
|---|---|---|
| a. | Bob Collett, labor expense (71 hrs. at $17.72) | $1,258.12 |
| b. | Air Craft Co. bill for parts and labor | 1,021.86 |
| c. | Collett, food and lodging | 354.66 |
| | | $2,634.64 |

14. Horizons claims as an incidental expense its cost of "cover." Specifically, Horizons paid $3,500.00 for a temporary replacement engine and $16,672.00 for a permanent replacement engine. Horizons paid transportation costs of $674.87 to obtain delivery of the temporary replacement engine. Horizons contends it is entitled to recover these amounts as "expenses or commissions in connection with effecting cover . . ." pursuant to SDCL 57A–2–715(1). For reasons stated in its Conclusions of Law, this Court concludes Horizons may not recover these amounts as incidental damages in this case.

15. As its final element of incidental damages Horizons seeks recovery of $265.18 which it paid to transport the defective engine from the Avco factory to Horizons, following the FAA inspection of the engine. See, Exhibit 22, Tr. 99. The FAA inspection failed to uncover any defect in the engine and Avco, therefore, denied warranty coverage.

16. From 1976 to the present, Horizons experienced steady financial growth. In 1977 and 1978, Horizons had sufficient contract work available to occupy both its aircraft in aerial photography and surveying on every available flight day. Horizons lost 11 flight days in 1978 because of the defective condition of the Avco engine. See, Exhibits 14, 21. Consequently, Horizons was unable to complete its 1978 contracts in that year and was forced to utilize flight days in 1979 and 1980 to complete those contracts. Because it needed to complete 1978 contracts, Horizons was unable to bid for a full season of new contract work in 1979. In making its claim for consequential damages in this case, Horizons contends

that by utilizing flight days in 1979 and 1980 to complete its 1978 contracts, it was paid for those days to the same extent that it would have been paid had it been able to utilize those flight days for new contract work. There remains, therefore, a net loss of productive capacity due to the failure of the engine to operate properly on eleven days in July and August 1978—the best part of the flying season for aerial photography and surveying.

17. The evidence at trial indicated, to a reasonable degree of certainty, that had Horizons been able to complete flights on those days it would have received gross earnings of $70,845.00. From this figure, Horizons makes deductions for expenses which it saved by not flying those days. Accordingly, Horizons subtracts $1,596.00, as the cost of film and materials saved, and $12,982.50, as the total cost of plane time saved. The remaining claim of $56,265.00 for downtime, therefore, includes an element of lost profit and the cost of overhead which Horizons incurred notwithstanding the downtime. In this respect, the president of Horizons testified that it retained and paid its processing staff even though there was a lack of developing and processing work to be done in the fall of 1978, because the 1978 contracts could not be completed. *See,* Exhibit 21.

18. By publishing its list of "authorized domestic distributors," by refusing to sell its aircraft engines except through these distributors, and by encouraging the distributors not to maintain inventories but to handle sales on a transaction-by-transaction basis, Avco caused Horizons to believe that its distributor, Aviation Sales, Inc., was Avco's agent for the purpose of selling remanufactured aircraft engines. Aviation Sales, Inc., therefore, was the ostensible agent of Avco. SDCL 59–1–5. The evidence indicates that Avco, at the time the contract was entered, had reason to know the particular requirements of Horizons because James Spell told Aviation Sales the

nature of Horizons' business in aerial photography and mapping.[2] Avco also had reason to know the general requirements of Horizons in purchasing the engine for use in its business. Because Avco holds itself out as a manufacturer of "utility aircraft" engines, (see, Exhibit 75), it knows that its engines are used in business aircraft and that the failure of an engine to operate as intended will cause economic losses to businesses, including lost profits or production.

19. Avco transacts business in South Dakota and has the following jurisdictional contacts with South Dakota: a) Avco serves the market in South Dakota for its remanufactured engines through authorized distributors, such as Aviation Sales, and dealers, such as Casper Air Service. Avco places no geographic limitations upon the sale of its engines and it knew its engines were being sold to customers in South Dakota; b) Avco offers factory service assistance to customers in South Dakota; c) Avco mails to Horizons its service letters, instructions, and bulletins; d) Avco advertises utility aircraft engines in trade journals which are reasonably calculated to reach, and do reach South Dakota.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. South Dakota law applies to this dispute because the Court's jurisdiction is based upon diversity of citizenship.

2. This Court has personal jurisdiction over the defendant Avco. The South Dakota long-arm statute provides, *inter alia,* that "[a]ny person is subject to the jurisdiction of the courts of this state as to any cause of action arising from ... (1) The transaction of business within the state...." SDCL 15–7–2. Jurisdiction over non-resident defendants under SDCL 15–7–2 extends as far as the standard of due process permits. *Ventling v. Kraft,* 83 S.D. 465, 161 N.W.2d 29 (1968). The "contacts" of Avco listed above establish that

---

2. Avco is deemed to have notice or knowledge of these facts communicated to its agent, Aviation Sales. *See,* SDCL 59–6–5.

Avco has purposefully acted and consummated transactions in South Dakota, and some of those actions form the basis for the claim made by Horizons. See, *Woolridge v. Beech Aircraft Corp.,* 479 F.Supp. 1041 (W.D.Mo.1979); *Red River Transport and Development Co., Inc. v. Custom Airmotive,* 497 F.Supp. 425 (D.N.D.1980). Under similar circumstances, the South Dakota Supreme Court held that a nonresident printing press manufacturer was subject to the jurisdiction of South Dakota courts with respect to breach of warranty claims made by a resident buyer. *Drier v. Perfection, Inc.,* 259 N.W.2d 496 (S.D.1977).

■ Principles of due process do not preclude the exercise of *in personam* jurisdiction by this Court over Avco. Avco has sufficient minimum contacts with this State so that the assertion of personal jurisdiction over Avco is consistent with traditional notions of fair play and substantial justice. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Hanson v. Denkla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). To reach this conclusion, this Court considered, (1) the nature and quality of the contacts with South Dakota; (2) the quantity of the contacts; (3) the relation of the cause of action to the contacts; (4) the interest of South Dakota in providing a forum for its residents; and (5) the convenience of the parties. *Mountaire Feeds, Inc. v. Agro Impex, S.A.,* 677 F.2d 651 (8th Cir.1982); *Aaron Ferer & Sons v. Diversified Metals Corp.,* 558 F.2d 450, 453 (8th Cir.1977).

■ The record clearly establishes that Avco places no geographic restrictions upon the sale of its remanufactured engines through its authorized distributors. Avco knew its engines were being sold to and operated by customers in South Dakota. Thus, the sale of its engine to Horizons was not simply an isolated occurrence, but arose from the efforts of Avco to serve the South Dakota market for its products, both directly and indirectly. Avco certainly could control its contacts with South Dakota and chose to engage in conduct aimed at delivering its engines to this state. "The forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *World-Wide Volkswagen Corp. v. Woodson,* 100 S.Ct. at 567. The exercise of personal jurisdiction by this Court over Avco, under SDCL 15–7–2(1), comports with the standard of due process. *See also, Noel v. S.S. Kresge Co.,* 669 F.2d 1150 (6th Cir.1982); *Plant Food Co-op v. Wolfkill Feed & Fertilizer,* 633 F.2d 155 (9th Cir.1980); *Ford Motor Co. v. Atwood Vacuum Machine Co.,* 392 So.2d 1305 (Fla.1981); *Volkswagenwerk, A.G. v. Klippan,* 611 P.2d 498 (Alaska 1980); *Braband v. Beech Aircraft Corp.,* 72 Ill.2d 548, 21 Ill.Dec. 888, 382 N.E.2d 252 (1978); *Gray v. American Radiator & Standard Sanitary Corp.,* 22 Ill.2d 432, 176 N.E.2d 761 (1961).

■ 3. Avco is a merchant with respect to the sale of remanufactured engines for utility aircraft. Avco sold the engine in question under an implied warranty that the engine was fit for the ordinary purpose for which such engines are used.[3] SDCL 57A–2–314.

■ 4. Avco's first defense to Horizons' implied warranty claim is that Avco has no liability for claims of direct economic loss under an implied warranty theory because there was no privity of contract between Horizons and Avco. This Court concludes that lack of privity is no defense in South Dakota in a breach of implied warranty action by a remote buyer against a manufacturer even though the buyer seeks only

---

3. Horizons also stated claims in its complaint for breach of an implied warranty of fitness for a particular purpose and for breach of an express warranty based upon Exhibit 3. The former claim is legally insufficient because Horizons failed to prove that it relied upon the skill or judgment of Avco or Aviation Sales to select or furnish a suitable engine. *See* SDCL 57A–2–315. The latter claim also fails for reasons stated in Conclusion of Law, No. 5.

the recovery of damages for economic losses.

Avco correctly observes that a majority of courts retain the pre-Code rule requiring privity of contract in these circumstances. *See*, White & Summers, *Uniform Commercial Code*, Sections 11–5, 11–6 (1980). The UCC, however, is neutral concerning the privity requirement and leaves further development of warranty protection to the courts. UCC 2–318 lists three alternative provisions which states may consider in extending warranty protection to certain classes of beneficiaries.

South Dakota adopted UCC 2–318, Alternative C, but with some critical variations. SDCL 57A–2–318 provides:

"A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section."

SDCL 57A–2–318 is similar to Alternative C, except that Alternative C limited warranty coverage to injuries "to the person" of a beneficiary. SDCL 57A–2–318 excludes any such limitation. Accordingly, South Dakota courts have authorized actions against manufacturers by non-privity buyers based upon warranty theories. In *Drier v. Perfection, Inc.*, a non-privity buyer recovered consequential damages for economic loss on its warranty claims against the manufacturer of a printing press. 259 N.W.2d 496 (S.D.1977). Likewise, in *Midcontinent Broadcasting Co. v. Dresser Industries*, 486 F.Supp. 858 (D.S.D.1980), lessees of a television tower were held entitled to damages as against the manufacturer of the tower, even in the apparent absence of privity.

■ Apart from this strong precedent in South Dakota, this Court would still be compelled to agree with those courts which have rejected traditional justifications for the defense of lack of privity in this context. *See, e.g. Industrial Graphics, Inc. v.*

*Asahi Corp.*, 485 F.Supp. 793 (D.Minn.1980); *Lang v. General Motors Corp.*, 136 N.W.2d 805 (N.D.1965); *State Farm Mutual Auto Insurance Co. v. Anderson-Weber, Inc.*, 252 Iowa 1289, 110 N.W.2d 449 (1961); *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279 (Alaska 1976); *Western Equipment Co., Inc. v. Sheridan Iron Works, Inc.*, 605 P.2d 806 (Wyo.1980) (the Wyoming counterpart to UCC 2–318 is identical to SDCL 57A–2–318). Accordingly, because Horizons reasonably could have been expected to use or be affected by the engine, Avco's implied warranty of merchantability extends to Horizons.

5. Avco's second defense to the implied warranty claim is based upon Exhibit 59, Avco's "Limited Standard Warranty." The warranty purports to limit the obligation of Avco to the repair and replacement of defective parts. It purports to limit the duration of implied warranties to the six-month limit on the repair and replacement remedy. Finally, Exhibit 59 purports to exclude any liability on Avco's part for consequential damages.

■ This Court concludes that Avco failed to prove[4] that its Limited Standard Warranty was part of the contract for the sale of the engine. Consequently, Exhibit 59 does not operate to limit Horizons' remedies, disclaim warranties or exclude consequential damages. Initially this Court must note the competing positions taken by Avco in this case: while it vehemently denies privity of contract with Horizons, it requests the court to hold that Horizons is bound by the limited warranty which Avco unilaterally injected into the transaction *after* the purchase agreement was entered. Avco cannot have it both ways. During the negotiations for the purchase of the engine Horizons was never informed of, nor did it discuss in any way the limited warranty. The terms of the limited warranty were not disclosed to Horizons prior to the purchase agreement and were not bargained for as a part of the contract. Instead, Exhibit 59

---

4. Avco has the burden of proving that its limited warranty was an integral part of the contract. *Taterka v. Ford Motor Co.*, 86 Wis.2d 140, 271 N.W.2d 653 (1978).

was sent by Avco, attached to the engine, and was received by Horizons when the engine was delivered.

 Warranty disclaimers and exclusions are not favored in the law and, therefore, to be effective, they must be exclusively negotiated or bargained for. *Dorman v. International Harvester Co.*, 46 Cal. App.3d 11, 120 Cal.Rptr. 516 (1975). This requirement will assure that warranty limitations are brought to the attention of the buyer when the contract is made. *Mack Trucks of Arkansas, Inc. v. Jet Asphalt & Rock Co.*, 246 Ark. 101, 437 S.W.2d 459 (1969). For this reason, the prevailing rule is that a warranty limitation stated in printed matter given by the seller to the buyer after the sale is not binding. Likewise, when no disclaimer is made as a part of the oral sales contract, the buyer is not bound by a disclaimer which is stated in a clause of the printed warranty which is shipped or delivered to the buyer with the goods. *See, Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.*, 28 Wash.App. 539, 625 P.2d 171 (1981); *Gideon Service Division v. Dunham Bush, Inc.*, 80 Ill.App.3d 633, 35 Ill.Dec. 952, 400 N.E.2d 89 (1980); *Pfizer Genetics, Inc. v. Williams Mgt. Co.*, 204 Neb. 151, 281 N.W.2d 536 (1979); *Dougall v. Brown Bay Boat Works & Sales, Inc.*, 287 Minn. 290, 178 N.W.2d 217 (1970); White & Summers, *Uniform Commercial Code*, § 12–5, p. 445 (1980); 1 Anderson, *Uniform Commercial Code* (2 ed.) § 2–316:26, p. 695. The Eighth Circuit recently followed this rule. *Wilson v. Marquette Electronics, Inc.*, 630 F.2d 575 (8th Cir. 1980).

Bob Collett, Horizons' chief pilot, knew Avco had a warranty on the engine. He glanced at Exhibit 59 when it arrived attached to the engine and he sent back to Avco a form to register the warranty. (Tr. 236). Although he read the "repair and replacement" limitation, he did not understand the meaning of the exclusion of consequential damages at the time he mailed the registration form to Avco. (Tr. 288–289.)

 Standing alone, the return of the registration form cannot constitute a modification of the contract, nor does it indicate Horizons' intent to relinquish the warranties and remedies applicable by law in favor of Avco's Limited Standard Warranty. In *Van Den Broeke v. Bellanca Aircraft Corp.*, 576 F.2d 582 (5th Cir.1978), the aircraft manufacturer also unilaterally injected its warranty disclaimers and limitations after the purchase agreement was entered. When the limited warranty was delivered with the plane, the buyer also returned to Bellanca its warranty registration card. The court refused to hold that this conduct indicated the agreement of the buyer to the terms of the limited warranty, which were not previously bargained for. The court also observed that the registration card did not contain the warranty disclaimer, did not incorporate the disclaimer by reference, and was not signed by the buyer. Likewise, in this case, the warranty registration form mailed by Collett is not in evidence and the Court cannot analyze its terms to determine Horizons' understanding of the limited warranty. *See also, Cambern v. Hubbling*, 307 Minn. 168, 238 N.W.2d 622 (1976).

Because Exhibit 59 is not part of the bargain in this case, the Court need not determine whether the "repair and replacement" limitation failed of its essential purpose or whether the consequential damages exclusion was unconscionable.[5] SDCL 57A–2–719. Since the agreement provided no remedy in substitution for those provided by the UCC, Horizons may recover damages according to the rule for a breach in regard to accepted goods. SDCL 57A–2–714.

 6. An implied warranty of merchantability accompanies all goods sold by a merchant of goods of that kind when the

---

**5.** For the reasons set forth above, the Court concludes that Horizons failed to prove Exhibit 3 was an express warranty applicable to this sale. Exhibit 3 is a service letter received by Horizons from Avco *after* Horizons had ordered the engine in question. In its post-trial brief, at p. 10, Horizons admitted "Exhibit 3 was not part of any transaction...." The evidence supports this admission.

implied warranty is not expressly excluded or limited. SDCL 57A–2–314. To be merchantable, goods must be fit for the ordinary purposes for which such goods are used. The Avco remanufactured engine purchased by Horizons failed to meet this basic standard of merchantability. The Court, therefore, concludes that Avco breached its implied warranty of merchantability. The evidence also establishes that Horizons suffered damages which were proximately caused by and resulted from the breach.

■ 7. Horizons accepted the engine it purchased from Avco. To avail itself of remedies under the UCC, a buyer who has accepted goods must notify the seller of any breach within a reasonable time after he discovers or should have discovered the breach. SDCL 57A–2–607(3)(a). Horizons informed Avco on several occasions of the malfunctioning of the engine, shortly after the engine was installed. Horizons sent reasonable and timely written notice of its problems with the engine to Avco on August 19, 1978. *See,* Exhibit 14. The Code does not require any particular type of notice in any particular words. *See,* UCC 2–607. Official Comment 5 states that "[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." *Id. See also, Lewis v. Mobil Oil Corp.,* 438 F.2d 500 (8th Cir.1971). Avco was well informed of the troublesome nature of the engine purchased by Horizons.

8. SDCL 57A–2–714 provides that where the buyer has accepted goods he may recover as damages the loss resulting in the ordinary course of events from the seller's breach. This loss is commonly measured by use of the formula set forth in SDCL 57A–2–714(2): the difference at the time and

place of acceptance between the value of the goods as accepted and the value they would have had if they had been as warranted. The difference in value can be computed by reference to the cost of repairing the goods so that they meet warranty standards. *Carlson v. Rysavy,* 262 N.W.2d 27 (S.D.1978).

9. Horizons' cost of repairing the Avco engine to operate as warranted is comprised of the following elements:

| | | |
|---|---|---:|
| (a) | Collett labor for installation [6] (Finding No. 11) | $ 124.04 |
| (b) | Collett labor for unscheduled maintenance (Finding No. 12) | 1,075.60 |
| (c) | Collett labor for removal and inspection (Finding No. 13) | 1,258.12 |
| (d) | Collett labor for overhaul (Finding No. 9) | 2,532.66 |
| (e) | Service assistance and parts (Finding Nos. 9, 13) | 4,983.95 |
| | Total | $ 9,974.37 |

Thus, Horizons is entitled to recover from Avco the amount of $9,974.37 as general damages under Section 2–714 for its breach of the implied warranty of merchantability.

■ 10. SDCL 57A–2–715 allows for the recovery of incidental damages from the seller in the event of a breach. The remaining elements of Horizons' claim for incidental damages are as follows:

| | | |
|---|---|---:|
| (a) | Collett, food and lodging (Finding No. 13) | $ 354.66 |
| (b) | Costs to transport engine (Finding No. 15) | 265.18 |
| (c) | Cost of temporary replacement engine | 3,500.00 |
| (d) | Cost of permanent replacement engine (Finding No. 14) | 16,672.00 |
| (e) | Costs to transport replacement engine | 674.87 |

The Court agrees that expenses incurred as a result of a seller's breach in the care, custody and transportation of defective

---

**6.** Horizons sought recovery for the items in paragraphs (a), (b), (c), and part of (e) (Air Craft Co. bill of $1,021.86), as incidental damages under SDCL 57A–2–715. There appears to be authority to support labeling these costs of repair as incidental damages, *see, Lewis v. Mobil Oil Corp.,* 438 F.2d 500, 507 (8th Cir. 1971); Annotation, 96 A.L.R.3d 299, § 8, cases cited; as consequential damages under SDCL

57A–2–715(2)(b), *see,* White & Summers, *Uniform Commercial Code,* § 10–4, p. 392 (1980); or as part of the difference-in-value damages recoverable under section 2–714(2). *See, Curtis v. Murphy Elevator Co.,* 407 F.Supp. 940 (E.D.Tenn.1976); *Custom Automated Machinery v. Penda Corp.,* 537 F.Supp. 77 (N.D.Ill. 1982). This Court has followed the latter approach.

goods may be recovered as incidental damages. *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.,* 86 Ill.App.3d 980, 42 Ill.Dec. 25, 408 N.E.2d 403, 409 (1980). Reasonable travel expenses of an employee of the buyer, incurred in the course of repairing defective goods, are also recoverable. *Willred Co. v. Westmoreland Metal Mfg. Co.,* 200 F.Supp. 59 (E.D.Pa.1961). This Court concludes that Horizons incurred the reasonable expenses listed in paragraphs (a) and (b) as a result of and incident to Avco's breach of the implied warranty.

Horizons may not recover its claim for the cost of "cover" represented by the items set forth in paragraphs (c), (d), and (e). The Code provisions concerning the buyer's right to cover apply to a breach by a seller who fails to make delivery or repudiates or when the buyer rightfully rejects or revokes its acceptance of the goods. SDCL 57A–2–711. Horizons accepted the engine and never revoked its acceptance. Furthermore, Horizons has not sought recovery of general damages under Section 2–712(2), the section which sets forth the measure of damages for a breach under Section 2–711, wherein the buyer has "covered." Instead, Horizons seeks both the cost to repair the defective engine to warranty condition, and the cost of two replacement engines. Horizons has cited no authority, and this Court has found none, which indicates a buyer who has accepted goods may recover the cost of cover as an incidental expense. This Court concludes, therefore, that Horizons may not recover the claims set forth in paragraphs (c), (d), and (e), under SDCL 57A–2–715(1), as "expenses ... in connection with effecting cover...." Thus, Horizons is entitled to recover from Avco the amount of $619.84, as incidental damages.

11. SDCL 57A–2–715(2) provides for recovery of consequential damages from the breaching seller. Consequential damages include losses resulting from the buyer's general or particular requirements of which the seller had reason to know at the time of contracting. For its consequential damages, Horizons seeks $56,265.00 as the value of productive capacity lost during the engine's down time. This figure includes a claim for lost profits plus the cost of overhead expenses incurred by Horizons without the benefit of income to meet the expenses during the down time.

It is well settled that buyers of business equipment or machines may recover lost profits as consequential damages. Lost profits may be calculated by reference to the "down time" caused by the period of equipment failure which constituted the breach of warranty. *See, e.g., Lewis v. Mobil Oil Corp.,* 438 F.2d 500 (8th Cir.1971); *Drier v. Perfection, Inc.,* 259 N.W.2d 496 (S.D.1977); *R. Clinton Construction Co. v. Bryant & Reaves, Inc.,* 442 F.Supp. 838 (N.D.Miss.1977); *Alliance Tractor & Implement Co. v. Lukens Tool & Die Co.,* 204 Neb. 248, 281 N.W.2d 778 (1979); *Clark v. International Harvester,* 99 Idaho 326, 581 P.2d 784 (1978). The buyer's evidence must show with reasonable certainty both the occurrence and the extent of the loss of profits.

SDCL 57A–2–715(2)(a) also requires Horizons to show that its lost productive capacity resulted "from general or particular requirements of which [Avco] at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise."

Avco circulated a list of its "Authorized Domestic Distributors." *See,* Exhibit 66. Horizons personnel knew that Avco refused to sell its remanufactured engines except through one of these *authorized* distributors. Accordingly, Horizons sought to purchase the engine through Aviation Sales. This Court concludes that Avco by this conduct caused Horizons to believe that Aviation Sales was its agent for the sale of remanufactured engines. Avco can hardly deny that it has manifested its consent for distributors to act on its behalf when it deals with third persons only through distributors who are "authorized" conduits for Avco engines. Horizons reasonably believed Aviation Sales had authority to bind Avco to the terms of any sale. SDCL 59–

1–5, 59–3–3. Under these circumstances, Aviation Sales was the ostensible agent of Avco for the purpose of selling remanufactured engines.

SDCL 59–6–5 provides that a principle and agent "are deemed to have notice of whatever either has notice of ...." Thus, when James Spell told Aviation Sales' management personnel the nature of Horizons' business in aerial photography and mapping, Avco was deemed to have notice of Horizons' particular needs in connection with the purchase of the engine. It was reasonably foreseeable that the failure of the engine to operate as warranted would disrupt business production at Horizons and cause a loss of profits. Other courts have recognized that the "reason to know" requirement may be satisfied by a buyer's communication of his needs to the agent of the seller. *Lewis v. Mobil Oil Corp.; Certain-Feed Products Corp. v. Goslee Roofing & Sheet Metal, Inc.*, 26 Md.App. 452, 339 A.2d 302 (1975).

Horizons calculated its lost production claim by utilizing a formula approved in *Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784 (1978). Thus, Horizons included the following factors on Exhibit 21: (a) the number of square miles the aircraft, with engines functioning properly, could cover in an hour of flight time based on Horizons' experience; (b) the contract payment rate per square mile for flights in the aerial photography business during the various periods of down time; (c) operation costs; and (d) the number of hours of down time because of engine malfunctions. By reference to these factors, Horizons established with reasonable certainty both the occurrence and the extent of its loss of productive capacity.

12. The losses set forth in Horizons' claim for consequential damages could not reasonably be prevented by cover or otherwise. Horizons made reasonable efforts to mitigate its damages by purchasing two replacement engines.

13. Avco objects to the use of gross receipts as a measure of recovery and contends that Horizons should be limited to recovery of loss of net profits. Other courts, however, have computed "down time" damages by reference to gross income, so long as a deduction from this figure is made for all operation costs saved by reason of the down time. *See, e.g., Jerry Alderman Ford Sales, Inc. v. Bailey*, 154 Ind.App. 632, 291 N.E.2d 92 (1972); *Alliance Tractor & Implement Co. v. Lukens Tool & Die Co.*, 204 Neb. 248, 281 N.W.2d 778 (1979). Accordingly, Horizons subtracted from the contract price, (a) the cost of materials, and (b) the cost per hour of using the Cessna 310 aircraft. The evidence indicated, however, that the contract price included an amount necessary to pay the overhead expense to Horizons for paying its film processing and mapping personnel. Horizons incurred this expense in the fall and winter of 1978 even though the down time caused both a loss of gross receipts and a loss of processing work to be done by these employees. Horizons paid the overhead necessary to maintain the specialized personnel even though they remained idle during much of this time period. Thus, Horizons did not save this expense and made no deduction from gross receipts for this expense in their claim for lost productive capacity.

14. Contrary to Avco's contention, the fact that 1978 contracts were eventually completed by using flight days in 1979 and 1980 does not indicate Horizons suffered no loss of production or that an "increased cost of performance" measure of damages would better approximate Horizons' loss. By using flight days in 1979 and 1980 to complete 1978 contracts, Horizons "borrowed" flight days which would have been spent profitably on new contracts which its business experience clearly demonstrates were available. Thus, there remains a net loss of production time in 1978, proximately caused by engine malfunctions. Horizons did not seek recovery of lost profits based upon the contract price per square mile which it received on 1979 and 1980 contracts, even though it utilized valuable flight days in those years to complete 1978 contracts, and even though the 1979 and 1980 contract

prices exceeded the amount received on 1978 contracts. Instead, Horizons makes its claim by reference to actual costs incurred for specific 1978 contracts. This Court finds this method of calculating its losses to be reasonable in view of the nature of Horizons' business. Horizons, therefore, shall recover $56,265.50 from Avco under Section 2–715(2) for Avco's breach of its implied warranty of merchantability.

## CONCLUSION

For the foregoing reasons, the Court finds that Avco breached the implied warranty of merchantability accompanying the engine sold to Horizons. Avco is liable, therefore, in the amount of $66,859.71. The Court will enter its judgment accordingly.